**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| WESLEY FINANCIAL GROUP, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC, DIAMOND RESORTS HAWAII COLLECTION DEVELOPMENT, LLC, and DIAMOND RESORTS MANAGEMENT, INC.,<br><br>      Defendants. | Case No.: _____<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL REQUESTED** |

Plaintiff Wesley Financial Group, LLC ("WFG"), files this Complaint against Defendants Diamond Resorts U.S. Collection Development, LLC, Diamond Resorts Hawaii Collection Development, LLC, and Diamond Resorts Management, Inc. (collectively, "Diamond" or "Defendants"), and states:

1. Diamond uses fraudulent, misleading, and high-pressure sales techniques to sell timeshares to unsuspecting consumers, who are led to believe that what they are purchasing is an "investment" that will increase in value, which they can rent easily such that the timeshare will "pay for itself," and which they can sell back to Diamond or another purchaser, without a financial loss, if they decide they no longer want it.  Diamond owners soon realize that they are victims of a bait-and-switch, however, and that the promises made to them by Diamond salespeople during the sales presentation were lies.

2.      Faced with the reality of rising maintenance fees, burdensome loan payments (with interest rates usually abutting the usurious limit set by state law), difficulty in making reservations, low-quality accommodations that are nothing like what they were shown during the sales tour, and the inability to rent their timeshares, many owners look for a way to escape their timeshares.  When Diamond refuses to take back the timeshare (contrary to what Diamond sales reps promised at the time of purchase) or to help them sell it, and other efforts to get rid of the timeshare prove fruitless, they often turn to timeshare exit companies like WFG for help.

3.      WFG has a proven track record of success in helping timeshare owners get rid of unwanted timeshares.  Founded in 2011, it is the largest timeshare exit company and has helped tens of thousands of people rid themselves of unwanted timeshares.

4.      WFG's services are necessary only because timeshare developers such as Diamond repeatedly make false promises and use manipulative, fraudulent, and high-pressure sales tactics to coerce people into purchasing timeshares, pursuant to contracts that last for an owner's lifetime and are often inherited by their children; and refuse to provide them with an expedient, affordable way to exit when they decide, for a variety of reasons, that they no longer want to own the timeshare.

5.      Diamond might change its business model and seek financial success by providing an excellent, customer-friendly product like Disney timeshares.  Not

all timeshare developers are dishonest like Diamond.  But if Diamond were to use honest, ethical, no-pressure sales practices, its profits would likely plummet.  So instead of changing its sales practices so that exit companies such as WFG were no longer necessary, Diamond has chosen to double down on its unethical and fraudulent behavior, devising multiple strategies to attempt to force WFG and other exit companies out of business.  Diamond was acquired by Hilton Grand Vacations ("HGV") in 2021, and this acquisition has not altered Diamond's fraudulent conduct. In fact, Diamond salespeople now routinely try to upsell owners with HGV Max, a program that allows access to Hilton properties. The lies and misrepresentations used by Diamond salespeople to push the new post-acquisition offering are wholly consistent with Diamond's pre-acquisition fraudulent conduct.

6.     First, Diamond brought suit against WFG in the Eastern District of Tennessee.  *See Diamond Resorts U.S. Collection Development, LLC., et al. v. Wesley Financial Group, LLC and Charles William McDowell III*, No. 3:20-cv-00251 (E.D. Tenn.) (the "Knoxville Litigation").  Diamond asserts causes of action for violation of the Lanham Act, violation of the Tennessee Consumer Protection Act, and the unauthorized practice of law.  Diamond does not bring this lawsuit to vindicate its own rights. Rather, the Knoxville Litigation and similar actions filed by Diamond and other timeshare developers are part of the developers' concerted plan to use aggressive litigation tactics to drive up litigation costs and make it too

expensive for exit companies to continue to operate. Richard Epstein, a partner with Greenspoon Marder who represents Diamond in the Knoxville Litigation and has represented many other developers in these exit company litigations, has stated at least twice in court records that timeshare developers want to put exit companies out of business through aggressive litigation tactics. Mr. Epstein stated the same at a hearing in a prior litigation against another timeshare exit firm – a comment that was so memorable that the magistrate judge, more than a year and a half later, referenced the comment in another hearing, stating:

> [O]bviously, you all chose to litigate in this manner, which is to bring all of these cases at once and to take on, you know, all of these and, you know – Epstein shouldn't have said it, but it always rings in my ears, Mr. Epstein, the first hearing I ever had in any of these cases was Mr. Epstein's first words were, These cases are about putting fake law firms out of business. So, you know, that just rung to me as something that we're just going to grind this out and file as many as we can, all at the same time, high costs.

7.     Epstein's comments merely confirm that there is ongoing collusion by and among several of the nation's largest public and privately held timeshare developers, often acting through the trade association to which Diamond and all other prominent timeshare developers belong—the American Resort Development Association ("ARDA").  Epstein recently confirmed his views on the record in a case pending in federal court in Nashville, Tennessee.

8.     In addition, Diamond instituted a policy requiring certain owners, as a condition of being released from their Diamond timeshare contracts, to sign an

affidavit under penalty of perjury, swearing that they have not paid or provided their Diamond credentials or log-in information to any third party as part of their attempts to exit their Diamond timeshares. The Diamond affidavits further state that any false statements made therein may be the basis for civil or criminal liability resulting in fines or imprisonment and that Diamond may pursue civil and criminal remedies against the owner.

9.    These affidavits serve no business purpose.  Rather, their sole purpose is to interfere with the contracts between WFG and its customers.  Diamond is happy to inflict harm on its own customers – timeshare owners who Diamond says it would have let out of their burdensome contracts if the owners had not engaged a third party to help them do so – in order to punish WFG.  In addition, Diamond colluded with other timeshare developers to institute a practice and policy of refusing to deal with owners who were assisted by WFG and other exit companies and instituted the affidavit practice to punish exit companies and force consumers to remain stuck in expensive, unwanted timeshares with abysmal service.

10.    Third, in response to the advent of firms like WFG, Diamond has developed its own purported exit program, the "Transitions" program, in an effort to take business away from exit companies such as WFG.  Instead of providing a real pathway for unhappy owners to exit their timeshares, Diamond uses Transitions as a yet another way to try to force owners to keep their worthless timeshares and into

a payment plan for delinquent amounts or some type of deferment arrangement. Even worse, Diamond uses the program to upsell owners (sell owners more timeshare product for more money) by convincing them that the problems they are experiencing with their timeshare will be solved if they only pay more money to Diamond and purchase a more expensive timeshare.

11.     Fourth, Diamond has conspired and colluded with the American Resort Development Association ("ARDA") and other timeshare developers to induce the Better Business Bureau to revoke WFG's accreditation and, consequently, to cause the American Association of Retired Persons ("AARP") to stop accepting advertisements from WFG that, prior to their revocation, directly resulted in millions of dollars' worth of revenue for WFG.

12.     Upon information and belief, the collusion detailed in this complaint began as early as 2018 and continues to this day.  Diamond colluded with and continues to collude with ARDA, including certain of its other board members, including Westgate, Hilton, and Bluegreen.

## PARTIES

13.     WFG is a Tennessee limited liability company with a principal place of business in Franklin, Tennessee.

14.     Defendant Diamond Resorts U.S. Collection Development, LLC ("U.S. Collection"), is a limited liability company organized under the laws of Delaware

with its principal place of business in Las Vegas, Nevada.  The sole member of U.S. Collection is Diamond Resorts Developer and Sales Holding Company, a corporation organized under the laws of Delaware with its principal place of business in Las Vegas, Nevada.

15.    Defendant Diamond Resorts Hawaii Collection Development, LLC ("Hawaii Collection"), is a limited liability company organized under the laws of Delaware with its principal place of business in Las Vegas, Nevada.  The sole member of Hawaii Collection is Diamond Resorts Developer and Sales Holding Company, a corporation organized under the laws of Delaware with its principal place of business in Las Vegas, Nevada.

16.    Defendant Diamond Resorts Management, Inc., is a corporation organized under the laws of Arizona with its principal place of business in Las Vegas, Nevada.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are completely diverse; the monetary amount in controversy exceeds $75,000, exclusive of attorneys' fees and costs; and the value associated with the injunctive relief sought exceeds $75,000, exclusive of attorneys' fees and costs.

18.     This Court also has subject matter jurisdiction over the claims arising under the Sherman Act alleged herein pursuant to 28 U.S.C. §§ 1331 and 1338.  This Court has subject matter jurisdiction over the claims sounding in state law alleged herein pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the Sherman Act claims that they form part of the same case or controversy.

19.     This Court has personal jurisdiction over Defendants pursuant to Fla. Stat. § 48.193 because Defendants are engaged in substantial and not isolated activity within the state of Florida, including having continuous and systematic general business contact with Florida.  Defendants' extensive contacts with Florida include, but are not limited to, the following:

a.   Defendant U.S. Collection maintains and operates 14 resorts in Florida.

b.   Defendants and their parent company, Diamond Resorts International, Inc. d/b/a Diamond Resorts ("DRI"), operate a regional corporate office and five sales centers in Orlando, Florida.  Several senior executives and officers are based out of this regional corporate office.

c.   As of June 2020, Defendants and DRI employed 1,457 people in Florida, including 676 in sales and marketing, 470 in resort operations, and 311 in the Orlando corporate office.  Upon information and belief these numbers remain substantial.

d.   As of January 31, 2020, Defendants had approximately 7,545 timeshare owners who resided in Florida.  Upon information and belief these numbers remain substantial.

e.   All Defendants are registered to do business in Florida.

20.   This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

21.   Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### Diamond's Fraudulent, Misleading and High-Pressure Sales Practices

22.   Diamond uses inducements such as concert tickets and discounted vacations to lure individuals to what Diamond advertises as 60- to 90-minute sales presentations. Once potential clients arrive, the presentation lasts for much longer – often for six to eight hours – and Diamond sales representatives exert extreme pressure on the potential owners not to leave until they make a purchase.

23.   Diamond salespeople are paid almost exclusively by commission and are encouraged to, at best, walk the line between truth and lies in making sales presentations to potential owners.  Diamond salespeople are thus incentivized to use

unethical sales practices, which have become rampant and are well-known to Diamond's management.

24.    Prospective owners consistently report similar material misrepresentations made by Diamond's salespeople during their presentations. These include:

a.  that timeshares are sound financial investments, and the owners will build equity as though they were purchasing real estate;

b.  desired timeshare units are available for owners to use whenever they like;

c.  maintenance fees never increase;

d.  owners can use the points that they purchase to pay their loan and/or maintenance fees;

e.  owners can rent their timeshares, such that the timeshare will pay for itself;

f.  owners can refinance their loan at a lower interest rate, with the sales representative's help; and

g.  if owners no longer want their timeshares, they can easily resell them (with Diamond's help), or Diamond will take them back.

25.     Salespeople are required to close the sale and get customers to sign a contract with Diamond **that day**, with no time to reflect on a contract that, by its terms, lasts a lifetime.

26.     One Diamond owner reported to WFG that when she tried to leave the sales presentation, the sales representative grabbed her by the arm, forced her to sit back in her chair, and told her that if she tried to leave the room with any Diamond paperwork, Diamond would have her put in jail.

27.     To create a false sense of urgency, Diamond often reiterates that the "deal" offered during the presentation is only available that day, falsely suggesting that prospective owners will never have the same opportunity again.

28.     Diamond representatives have gone as far as using flirtation and promises of intimacy – even promising a potential purchaser to meet him in his hotel room – in order to make a sale.

29.     After wearing them down for hours on end, Diamond takes the prospective owners to a separate room for a "closing."  During the closing, Diamond presents them with voluminous sales contracts and rushes them through signing the documents.   Even when customers request additional time to fully review the contracts, Diamond representatives push them to sign as quickly as possible.

30.     Although Diamond does not record the sales presentation – during which multiple promises are made by Diamond salespeople to consumers about the

value of the timeshare and the ease of renting or reselling it – Diamond *does* record the closing.  The Diamond contract contains a provision stating that it is the sole agreement that governs the owner's timeshare purchase and that it supersedes and replaces any and all prior agreements or understandings, either oral or written. Diamond representatives are therefore free to make any promises they want to a potential owner in order to make a sale, and Diamond will hide behind this disclaimer when the owner realizes that the promises were in fact lies.

31.     In addition, Diamond requires owners to fill out a document stating three reasons that the owner wants to enter into the timeshare contract.  If the client includes on the list one of the false promises that a sales representative made to them – such as that they will have lower maintenance fees if they purchase additional points, or that they will be able to rent out the timeshare and make money – the salesperson will tell them that they cannot include those reasons and will guide the owner on what reasons they should list on the document.

32.     Owners are often issued a credit card, facilitated by Diamond, sometimes without their knowledge or understanding, to provide funding for the down payment of a financed purchase. During the presentation, a sales representative will often ask for some financial information to be completed and then use that to both run a credit check and determine how much they could offer as a down payment via newly issued credit card, on the spot. The new credit card and

subsequent statement, however, will not arrive in the mail until well after the recission period has passed.

33.     Moreover, Diamond will often represent to the consumer that the "points" that they earn by using the credit card can be used to offset a large portion of their loan payments and/or to pay their maintenance fees in their entirety.  Owners soon find out, however, that even if they use the credit card for all of their household expenses, they only earn a few dollars' worth of points each month – nowhere near enough to make an appreciable dent in their obligations to Diamond.

34.     In addition to the loan payments and exorbitant interest, Diamond charges maintenance fees on an annual basis, regardless of whether or how often a timeshare owner actually uses their timeshare. While many prospective Diamond owners are promised during the sales presentation that their maintenance fees will never increase, they quickly find that their maintenance fees go up every year.

35.     While Diamond timeshare interests may have subjective value to some portion of Diamond's customers, they are objectively worthless because there is no secondary market for these products.  They literally cannot be given away in many instances because of the onerous, inflated, yet ever increasing "maintenance" fees charged by Diamond which really are nothing more than a disguised profit center unconnected to the real cost of maintaining the timeshare.  The only operational

"market" for Diamond timeshares is in the Diamond timeshare sales presentation chambers at Diamond.

36.    While rooms are not always available to Diamond owners, they are available to the general public through third-party booking sites such as Expedia or Hotels.com.  Diamond owners have told WFG that after being told that there was no availability at a Diamond resort during a given week, they found rooms available for the same property during the same week via a third-party site.  In reality, Diamond sets aside these rooms for the general public, to the exclusion of Diamond owners, for the simple reason that it generates more profit for Diamond. In other words, Diamond can generate profits from non-owner rentals while simultaneously collecting monthly debt payments from owners for the same accommodations that they are precluded from actually using.

37.    When a Diamond owner does manage to reserve a booking to visit to their timeshare, they are often required to attend additional sales pitches framed as "owner update" meetings.

38.    In addition to the standard timeshare developer tactics to coerce people into making an initial purchase, Diamond uses egregious lies and scare tactics to terrify owners into upgrading their timeshares.  Below are just a few examples of the extreme that Diamond will go to in order to get owners to purchase additional points:

a. Diamond told one owner – who had already informed the sales representatives that her sister was undergoing brain surgery and she therefore was not in a good frame of mind to sit through a sales presentation – that her maintenance fees would go up to **$250,000** if she did not upgrade.

b. A married couple told Diamond that they wanted to exit their timeshare because the husband had terminal brain cancer and they could no longer afford the timeshare. The sales representative told them that the only want to exit was to update to HGV Max and to take the husband's name off of the membership. He further told them that he would call them in a few weeks and help them sell the timeshare for over $30,000. He never called, and does not answer his phone at the number he gave the owners, who now have higher payments than they had before.

c. Diamond summoned two owners to an office during their vacation at a Diamond resort and told them if corporate audited their ownership they would be liable in the amount of **$300,000** for bonus points they had been given during their initial purchase and that they could be brought to court and charged with fraud. Diamond then told them that if they upgraded their ownership at a cost of $69,000, they would not be liable. Under enormous pressure and stress, the owners agreed to the upgrade,

but realized during the contract signing that they were actually being charged $99,000, with a down payment of $30,000.

d.  Two owners who had a paid-off timeshare from Gold Key, which was acquired by Diamond, were given a dinner and concert tickets while on vacation.  They were later told that they had to attend a presentation, since they had accepted the dinner and tickets.  During the presentation, the sales representative told the owners that if they did not switch to a Diamond timeshare, their maintenance fees would double from $1,000 to $2,000; they would no longer be able to book vacations; and they would be liable for **$50,000 to $125,000 per year** to cover damage from a storm the previous year.  The sales representative further told the owners that they would have to pay Diamond back for the dinner and concert tickets and that if they did not agree to switch to a Diamond timeshare that day they would be flagged as "non-cooperative owners" and be immediately liable for all of the above-mentioned fees.  The owners signed a contract, which the sales representative told them was merely switching their ownership from Gold Key to Diamond, but they later realized that they had taken out a new loan.  The owners tried to cancel the loan within the rescission period, but Diamond refused to speak with them.  Pursuant to the new contract, the owners were

required to pay $400/month in loan payments in $4,000/year in maintenance fees.

e. A sales representative told two owners during an upgrade presentation that they would be liable for **$200,000** unless they upgraded to Platinum status. He further told them that they would build equity under the new contract and would earn $1700/month, which would cover their monthly payments.

39.    After realizing they are paying an ever-increasing amount for timeshares that provide none of the freedom and flexibility promised by Diamond, many Diamond owners often attempt to sell their timeshare interests. These owners quickly find out that Diamond's assurances that they can easily resell the timeshares and recover their "investments" were also rank lies. Indeed, countless Diamond timeshares purchased for tens of thousands of dollars are listed for sale online for as little as $1.00, but remain unsold.

40.    Faced with mounting costs, limited vacation opportunities and a virtually nonexistent secondary market, Diamond owners often turn to Diamond itself, asking it to help them sell their timeshare interest, repurchase their timeshare interest, or terminate their maintenance fees in exchange for turning their timeshare interest over to Diamond. The owners quickly find out that the promise that

Diamond would take back, re-purchase or assist them in selling their timeshare was yet another lie.

41.    These owners are generally stonewalled with a deceptive and tortuous process designed to keep them paying, and to prevent them from exiting or otherwise terminating their timeshares. Unsurprisingly, Diamond makes it as difficult as possible for angry and disgruntled owners to get out of their contracts, interposing all manner of administrative hurdles and tricks meant to thwart owners' intent to exit often voidable contracts. For example, Diamond's customer service representatives have placed callers on hold for hours, only to hang up and force the owner to start the process over. And, when Diamond does offer a solution, it frequently consists of another misrepresentation: the owner's problems can be solved by simply purchasing more points or upgrades.

## WFG Offers a Legitimate Solution to Consumers

42.    Because so many timeshare owners, including Diamond owners, have been left without recourse, over the past decade an entire industry of timeshare exit companies has emerged to assist owners who need guidance on how to navigate the timeshare developers' web of deceit.  The birth of the timeshare exit industry was a direct result of the decline in quality and increase in pricing from certain fraudulent developers. The timeshare exit industry has forced certain improvements in the timeshare industry for timeshare owners.  Diamond and its co-conspirators wish to

eliminate WFG, and all successful exit firms, so that they can return to a time when their anti-consumer behavior was unconstrained.

43.     WFG is the most successful company in the timeshare exit business. Charles William McDowell III (known in the industry as Chuck McDowell), WFG's CEO, is a former timeshare sales representative who, after seeing the industry's lies and deception firsthand, left the industry soon after he started, and began assisting owners to get out of their timeshares – owners who often found it impossible to navigate the maze of red tape and administrative hurdles that timeshare developers intentionally erect to prevent owners from exiting. McDowell founded WFG with the mission of assisting customers seeking to obtain freedom from the never-ending financial bondage and emotional burdens imposed by their timeshare ownerships.

44.     WFG only accepts customers who believe and represent to WFG that they were lied to, misled, or pressured into purchasing a timeshare by Diamond (or the other bad actors in the industry). As a result, WFG declines thousands of potential customers each year.

45.     WFG enters into binding contracts with its customers.  In its contracts, WFG offers its customers a simple guarantee: if WFG cannot successfully assist the timeshare owner, the customer receives a full refund.

46.     The WFG contract contains confidentiality provisions that prohibit the owner from disclosing to the timeshare developer that they have hired WFG or

otherwise sharing with the developer any information concerning their engagement with WFG. WFG requires this non-disclosure provision because it knows that if a timeshare developer, including Diamond, finds out that WFG has been hired, it will retaliate against the customer by flagging their file and refusing to work with them on an amenable resolution to their dispute or the termination of their timeshare interests that Diamond would otherwise provide to the owner with WFG's assistance. This, even when termination might be of financial benefit to Diamond.

47.    WFG has been in business for over ten years and has hundreds of employees, some of whom previously worked for timeshare developers. Accordingly, WFG's employees are intimately familiar with the fraudulent tactics, deceit and lies employed by companies like Diamond.

48.    Armed with its in-depth institutional knowledge and extensive industry experience, WFG has developed proprietary methods for assisting customers. WFG understands the internal administrative maze of timeshare developers, which methods work best for specific timeshare developers, and when and how to navigate their processes to achieve customers' desired objectives. This process includes knowing which department to direct communications to, so as not to be transferred back to sales for a pitch to buy further timeshare interests. The result: tens of thousands of families have been released from their timeshare obligations, including annually increasing maintenance fees, mortgage payments, and "owner update"

meetings that are often as bad as, or worse than, the original sales presentations. WFG's exit services often result in timeshare owners being terminated by their developers via a mutual release, deed in lieu of foreclosure, deed back, charge off, purchaser's default, or foreclosure.

## Diamond's Anti-Consumer Business Practices

### A.  The Transitions Program

49.     Rather than put its own house in order and deal honestly with the public, Diamond seeks to destroy legitimate businesses like WFG that aid timeshare owners.

50.     After seeing the success of WFG, Diamond devised its Transitions program, which it advertises as an effective competitive alternative to WFG.

51.     While it is advertised as a way for owners to safely exit their Diamond timeshares, Transitions is actually a trap intended to further isolate Diamond owners and prevent them from exiting or otherwise terminating their Diamond timeshares – except when Diamond deems it beneficial to itself to take back a particular owner's timeshare.

52.     Transitions is strictly limited and offers no assistance to the vast majority of Diamond owners. For starters, it is not available to owners who have not fully paid off their timeshare loans, and Diamond requires that owners continue to pay their maintenance fees throughout the process of indeterminate length.

53.     Further, Diamond does not allow an owner's timeshare to be terminated unless Diamond believes it will be beneficial to Diamond to recover that owner's timeshare. Diamond actually benefits through its selective use of the Transitions program because it provides a vehicle for Diamond to replace owners who no longer have loans with new owners who will have loans – loans financed by Diamond, of course. Diamond does not permit other third-party financial entities to finance payments for its customers who wish to pay for their timeshare over the ten-year period offered by Diamond.  Once the former owner has paid in full for the timeshare collateral (and returns the collateral to Diamond without any payment for their equity[1]), Diamond can then re-sell that same collateral at a higher price with an exorbitant interest rate and make even more profits off the same timeshare interest. In addition, Diamond routinely securitizes these timeshare loans and sells them to investors, generating upfront cash and an additional income stream.

54.     Even when owners who might qualify for Transitions call Diamond seeking to relinquish their timeshare, Diamond does not routinely inform them of the existence of the program.  Instead, Diamond has told such owners that it does

---

[1] This is an important point that cannot be overlooked.  Diamond recovers these fully-paid real estate interests (from distressed owners) by charging the owners a fee to repossess their ownership interest – despite the fact that the debt-free owners technically, based on Diamond's own balance sheets and Diamond's resale of the repossessed interest, have significant equity in the properties.

not take back timeshares or otherwise help owners rid themselves of unwanted timeshares.

55.     Diamond charges an exit fee of $250 per contract in Arizona and $1000 per contract in all other states for an owner to use the Transitions program.

56.     In certain instances, Diamond has accepted the exit fee from an owner and then rescinded the offer of an exit, stating that the owner was not eligible to use Transitions because they still owed money on their loan or maintenance fees.

57.     At its core, Diamond's Transitions program is not designed to assist Diamond's current timeshare owners "exit" their timeshares. Instead, it is a vehicle of unfair competition and deception that harms legitimate players in the timeshare exit industry like WFG, as well as Diamond's customers. It harms WFG, in part, by diverting sales from WFG to Diamond. It harms customers, in part, by falsely promising an exit, extracting additional sums to qualify for the exit, and then denying the exit – locking the customer into their unwanted timeshare

## B.     Diamond Prohibits Owners from Working with Exit Companies

58.     Diamond has an array of both formal and informal policies and practices that operate to preclude timeshare owners from working with third parties to exit their timeshares. Though designed to deprive WFG and other exit companies of customers, Diamond's own exit policies and program are also unfair, against public policy and injurious to the very consumers Diamond claims it is "protecting."

59. If Diamond discovers that an owner that has applied for the Transitions program has consulted a third party such as WFG, it will "flag" the owner's account and deny the owner participation in the program unless the owner terminates their relationship with the third party. Further, Diamond "advises" that if the owner is "no longer working with this [exit] company," they should "file attorney general complaints" against the company "and submit proof of the same to Diamond Resorts." In some instances, Diamond has requested that owners seeking to have a flag removed from their account for documentation provide "anything…you have pertaining to this [exit] firm," including "contracts, receipts of payment, any refunds, any possible complaints filed against the [third party exit company] such as through the Better Business Bureau (BBB) or with your states Attorney General." Diamond claims that this "additional documentation" will prove that the owner is no longer affiliated with the exit company. Only after the owner submits such documents to Diamond will it let the owner know if they are eligible for the Transitions program.

60. Although Diamond mandates that its timeshare owners must not work with any third party, including legal counsel, Diamond freely uses attorneys and other third parties when negotiating with owners.

61. As a direct consequence of Diamond's policy of refusing to work with any owner that has consulted an exit company, WFG customers have terminated their contracts with WFG, resulting in significant financial harm to WFG. Further,

24

Diamond's interference and blanket prohibition on third-party assistance have caused potential customers to refrain from doing business with WFG.

62.     While discovery will certainly provide additional concrete evidence of harm to WFG, to date WFG has identified certain owners who stopped working with it after being offered an affidavit-based exit by Diamond.

### C.     Diamond Requires Owners to Sign Affidavits Disclaiming that They Worked with an Exit Company

63.     Beginning in August 2019, Diamond began requiring owners seeking to be released from their timeshares via the Transitions program to sign an affidavit (the "Owner's Affidavit") swearing that they had not used an exit company or other third party to assist them in attempting to exit their timeshares.  Diamond conditions a promised termination upon the signing of an Owner's Affidavit.

64.     In these Owner's Affidavits, which are purportedly made under penalty of perjury, the owners are required to swear (1) that they have not paid any third party to participate in the Transitions program or otherwise attempt to exit their timeshare, (2) that they have not provided their Diamond credentials or log in information to any third party for the purpose of facilitating their participation in Transitions or accessing their Diamond account, and (3) that they have not authorized any third party to pretend to be them.

65.     Diamond also uses the Owner's Affidavit to threaten owners with civil and criminal liability, including fines and imprisonment, if the Affidavit contains

any false statements.  Specifically, the Owner's Affidavit requires the owner to acknowledge that they understand that Diamond may disclose the Affidavit to a government entity and "that any false statement contained herein may result in civil liability or be punishable by fine, imprisonment, or both."  Owners must further acknowledge that they understand "that providing false and misleading information is not an authorized use of Diamond Resorts [*sic*] computer system and may constitute, amongst other things, a violation of the Computer Fraud and Abuse Act, a criminal act."  Finally, the Owner's Affidavit provides that if Diamond learns that the owner engaged a third party or provided false and misleading information, Diamond "may disqualify my application and pursue civil and criminal remedies."

66.    Certain WFG owners have in fact breached their contracts with WFG because of Diamond's use of the Owner's Affidavits – breaches knowingly caused by Diamond and its promises of an "agreed upon" exit.

67.    Diamond presents the Owner's Affidavit on a take-it-or-leave-it basis, refusing to allow timeshare owners to terminate or exit unless the owners sign the Affidavit. Relatedly, Diamond will not accept any edits or revisions to the Owner's Affidavit from its timeshare owners.  Worse, Diamond refuses to allow an owner to seek independent legal advice concerning these important legal documents.

**D.**  **Diamond and ARDA Collude to Injure WFG and other Timeshare Exit Companies, Including by Eliminating WFG's A+ Accredited Rating from the BBB**

68.     Because of WFG's success helping timeshare owners, Diamond and other timeshare developers have engaged in a long, far-reaching campaign to drive WFG out of business and to kill the exit industry that Diamond's own fraudulent and unethical sales practices helped create.

69.     Without expert exit companies like WFG, Diamond and other developers would have more financial leverage over their badly mistreated clients. Diamond seeks to eliminate its exit company competitors so it can better price gouge owners, and more easily deliver a deficient timeshare product.

70.     In addition to the programs and policies described above, Diamond has used its participation and leadership in ARDA as a tool to further harm WFG's business.  Hilton Grand Vacations, Inc. ("HGV"), which acquired Diamond in August 2021, is a member of ARDA.  Prior to the acquisition, Diamond itself was a member of ARDA.  Mark Wang, the President and CEO of HGV, is the past Chair of ARDA's Board of Directors, and Gordon Gurnik, Senior Executive Vice President and COO of HGV, is the Chair-Elect. Charles Corbin, Executive Vice President, Chief Legal Officer and General Counsel of HGV, and Hannah Vazzana, Senior Vice President and Chief Communications Officer of HGV, are both Directors of ARDA. Upon information and belief, the staff of ARDA only take

significant action with the permission of Board leadership, and only in furtherance of goals set by ARDA's leadership. Eliminating WFG and other exit companies is a stated goal of ARDA's leadership.

71.     The symbiotic relationship of ARDA and its timeshare developer members who run it is well documented.

72.     Upon information and belief, ARDA helps fund its operations through monetary contributions from Diamond and other timeshare developer members.

73.     Upon information and belief, Diamond and HGV representatives have participated in ARDA meetings to develop strategies to eliminate the timeshare exit industry – and particularly WFG and its founder Chuck McDowell, which appear to be its biggest and most important targets.

74.     Specifically, following a failed lobbying attempt to pass legislation in Florida and Nevada that would have made it illegal for any company or third party to assist a consumer with exiting a timeshare, ARDA members collaborated and colluded, devoting significant discussion in their ARDA and other meetings to develop strategies to kill the timeshare exit industry.

75.     ARDA and its developer members commenced a multi-pronged attack against the timeshare exit industry, including:

> a. Creating a shared portal where timeshare developers offer their own illusory exit services to their respective timeshare owners, called

"Responsible Exit," where the "exit services" ultimately mainly involve upselling owners instead of offering the desired exits;

b.  Media/press releases full of half-truths and amalgamations of exit company strategies designed to paint all exit companies as fraudulent or "scams";

c.  Impeding the ability of WFG and other exit companies to advertise by interfering with rating agencies and advertising sources;

d.  Sending threatening letters to individuals and companies who endorsed exit companies, including threats that their advertisers would be targeted if they did not cease endorsing exit companies; and

e.  Threatening exit companies and lawyers who assist timeshare owners in exiting their timeshares that they will be "eradicated."

76.   For example, in 2019, one trustee of ARDA wrote to a timeshare exit lawyer:

> I am a Trustee of ARDA and we have formed a timeshare exit company coalition, our initiative this year is to eradicate timeshare exit scam companies and attorneys…. I have notified all timeshare companies to be on the lookout for your firm and your standard form letters.  We have already had one (1) attorney disbarred and shut down (2) others.  If you have advised any client of any timeshare company to stop making their payments, you are next!

77.    Also in 2019, a trustee of ARDA wrote to another timeshare exit firm:

I am a Trustee with the American Resort Development Association "ARDA." It is ARDA's mission this year to eradicate timeshare exit firms.  One attorney has already been sued successfully… and is now disbarred. I have forwarded your firms [*sic*] information to the appropriate committee at ARDA.

78.    One purpose of "Responsible Exit" is to provide ARDA and its developer members with a public relations cover for its long-standing, anti-consumer practices toward longtime owners who want to get out of their timeshare contracts. The target audience of Responsible Exit is not only owners, but also lawmakers and regulators who might otherwise crack down on an industry that puts sales first and customers second, by enforcing often voidable one-sided contracts that lock owners into lifetime timeshare ownership.

79.    From the minutes of an ARDA meeting in about April 2019, discussing the rollout of "Responsible Exit," it is clear that instead of providing longtime owners with an easy path to terminate their timeshares, the program provides an outstanding platform to "upsell" owners to buy more expensive timeshares that they can ill afford and may never use. Meeting participants noted that the "best thing" they can do with exit is "judicial foreclosure, ruin the credit and enforce the contract."  In addition, it was recommended that each developer should have an exit strategy office with their call center, so that any requested exit also can be an

opportunity to upsell. It was further noted that only 40-50% of owners actually exit after reaching the exit-related office.

80.     Another purpose of "Responsible Exit" is to generate momentum and support for ARDA and its developer members' efforts to crush third-party exit firms and eliminate the competition from them.

81.     In or about May 2013, the Better Business Bureau of Middle Tennessee, Inc. ("BBB") agreed to list WFG as an accredited business.  After satisfying the BBB's Standards for Trust, WFG was accredited by the BBB.  Pursuant to their agreement, WFG paid the BBB a fee and the BBB listed WFG on its website as an accredited business.  In addition, the BBB licensed WFG to advertise its BBB accreditation using BBB logos in both online and more traditional advertising (newspapers, billboards, direct mail, tv ads, etc.).

82.     Upon information and belief, representatives of ARDA, at the behest of Diamond and its other timeshare developer members, affirmatively caused the BBB to breach its accreditation agreement with WFG and to suspend and revoke WFG's BBB accreditation and rating in late 2019. When this happened, WFG was not only accredited, it had an A+ and 5-star rating with the BBB based on over 100 customer reviews.

83.     Upon information and belief, ARDA representatives informed the BBB that its ultimate goal was to put WFG out of business.

84.     Despite multiple requests for reconsideration of the decision, including correspondence between WFG and BBB evidencing WFG's commitment and effort to comply with BBB's stated conditions, the BBB denied all appeals and refused to advise on any corrective action WFG could take.

85.     At one point in the discussion and appeal of BBB's revocation of WFG's accreditation, the BBB offered to reinstate the accreditation temporarily if WFG met a draconian set of conditions, which included turning over its entire customer base to the BBB.

86.     Upon information and belief, representatives of ARDA also convinced AARP, a major advertising publication, to terminate its business relationship with WFG and refuse to allow WFG to advertise with it based on WFG's loss of accreditation with the BBB.

87.     Upon information and belief, ARDA called and berated the AARP the day after WFG's accreditation and rating were revoked, criticizing the fact that the AARP magazine published a WFG advertisement when WFG had "lost" its BBB accreditation and A+ rating.

88.     Upon information and belief, ARDA coordinated dozens of purported AARP members to call AARP (on the same day) to "complain" to AARP about WFG's advertisement.  The timing and similarity of these calls is more than a coincidence and is unprecedented in WFG's history of advertising with AARP.

89.     ARDA further requested that the AARP publish a competing advertisement in opposition to WFG.

90.     In response to ARDA's direct contact with AARP and its actions that resulted in WFG's loss of its BBB accreditation, AARP refused to allow WFG to place more advertisements in its magazine. Had ARDA not interfered on behalf of Diamond with the BBB and AARP, AARP would have continued to permit WFG to advertise with it.

91.     WFG's advertisements with AARP, which ran for only a brief time before ARDA's interference, resulted in over $10 million in revenue for WFG.

92.     Upon information and belief, members of ARDA, including Diamond, have committed more than $1 million per month in legal fees to put WFG and other exit companies out of business.

93.     Upon information and belief, ARDA engaged in the above actions on behalf of Diamond, with Diamond's knowledge and within the scope of its agency relationship with Diamond.

94.     The relevant antitrust market is for the provision of exit services to Diamond customers who desire an exit from their timeshare contracts.  While there are many potential service providers in this market, Diamond is one of the largest and it has market power both in terms of market share and market structure.  WFG is the largest exit firm in the country, but exit services are provided by many small

firms, one-person shops, and lawyers. Diamond uses its power to prevent its clients who want exit services from using other exit providers who compete with Diamond's Transitions program, in violation of federal antitrust laws.

95.    Diamond's primary goal is to put exit firms out of business so that it can continue to raise prices and provide customers with substandard lodging and awful services. Maintaining high prices, diminished service and poor lodging facilities are Diamond's goals, as they increase Diamond's profits.

96.    Diamond provides timeshare vacation contracts to the general public. It claims to have more than 27,000 guest beds at 420 branded and affiliated resorts around the world.  Diamond initially competes with other timeshare developers for clients, including Disney, Westgate, Bluegreen, and Hilton. Once a timeshare developer wins a client, there is little ongoing competition. Each developer's lifetime contracts effectively lock consumers in with that developer's company.  Few consumers move from one timeshare developer to another after initially purchasing a timeshare, and developers do not compete for such transfer customers.

97.    Exit firms like WFG began to appear approximately ten years ago to fill a growing need for consumer assistance in the timeshare industry.  Over twenty years ago timeshare sales began as an ethical industry that provided reasonably priced family vacations for middle-class people.  But that changed over time, as developers began to use aggressive and oppressive sales tactics, some of which are

described in the preceding paragraphs, coupled with lies, misrepresentations, and poor service to increase developer profits.  As disillusioned consumers realized they were sold a false bill of goods and were making payments they could not afford for vacations that they could never book and that were available for less from third-party travel sites, they began looking for ways to exit their timeshare contracts.  Most first sought redress from their developers.  But because of their insatiable greed, developers refused to allow owners out of their contracts, no matter how dire an individual owner's personal circumstances, how poor the service provided, or how awful the developer's salespeople's fraud, lies and misrepresentations. As a result, former timeshare salespeople founded exit companies to help owners extricate themselves from the lifetime timeshare trap.

98.    Not all developers made a Faustian bargain.  For example, WFG rarely receives calls from customers seeking to exit a Disney timeshare.  And when it does, WFG advises such callers to contact Disney directly, knowing that Disney will do right by its clients.  Not so with Diamond.

99.    Diamond and other problematic developers have colluded and continue to collude with each other and via ARDA to put WFG and other exit firms out of business. Most of these developers have fashioned their own purported "exit programs" to compete with WFG's services. But because the developers do not compete between and among themselves for their respective existing customers,

they each would benefit from the demise of exit companies, including WFG.  The developers collude to eliminate WFG and other exit firms.

100.   One of the means of their collusion is ARDA. Based in Washington, D.C., ARDA is described on its website as "the trade association for the timeshare industry.  ARDA's membership comprises over 350 companies (both privately held firms and publicly traded corporations). ARDA's active, engaged members have extensive experience in shared ownership interests in leisure real estate."

101.   ARDA generally holds two annual conferences.  The fall conference, usually held in Washington, D.C., is limited to members only and focuses on "association governance as well as economic and political issues."  The spring conference is open to a wider audience and encourages the sharing of business ideas and networking. Upon information and belief, ARDA members communicate on a regular basis outside of both the annual meetings and ARDA board meetings.

102.   Many ARDA members have their own exit programs. These programs each compete with WFG, but not with each other.  Rather, the opposite is true.  Many of these developers advertise their exit programs on a common portal on ARDA's website, https://responsibleexit.com/.

103.   This coordinated advertising of exit programs (in addition to the extreme similarity of the programs) is but one way in which developers work together to put exit companies out of business.

104.    Another is the coordination of litigation against exit firms, using the same lawyers from the same law firms to bring simultaneous and similar complaints against WFG and other established exit firms. Again, the developers each want to put WFG and other exit firms out of business so that they can better exploit their clients with higher prices, poorer lodging and diminished service. Most of the major developers have seats on the board of ARDA, from which they can direct the trade association's business.  For example, at least four C-suite executives at HGV, which acquired Diamond in 2021, are current or former members of the ARDA board. *See* ¶ 70, *supra.*

105.    A third is the coordinated business practice of requiring owners who seek to exit their timeshares, as a condition of being released from their timeshare contracts, to sign an affidavit under penalty of perjury, swearing that they have not consulted with, paid, or otherwise received help from an exit company, lawyer, or any other third party in their attempts to exit their timeshares. In addition to Diamond, whose use of such affidavits is described above, developers including Westgate have required owners to execute such affidavits as a condition of exiting their timeshares. It is no surprise that the developers who are also ARDA members started using similar affidavits at approximately the same time. The affidavit practice might be opaque as between developers if they were competing against each other, but it is clear that they have shared this, and other anti-exit company tactics. Of

course, WFG is aware of the affidavits, as its customers often discuss them with WFG.

106.   A fourth means of collusion involved the simultaneous adoption by multiple developers of "zero tolerance" policies, pursuant to which they refuse to deal with any owner who is being assisted by a third-party exit company or attorney.

107.   A fifth means of collusion involves developers hiring the same lawyers and law firms, including Greenspoon Marder and Shutts & Bowen, to prosecute their coordinated and triangulated litigations against WFG and other exit companies. Of course, illegal conduct is not sanitized simply because it is done through an attorney. And both Greenspoon Marder and Shutts & Bowen are members of ARDA.

108.   A final means of collusion involved the use of (1) calls from an ARDA representative to the BBB in a successful effort to have the BBB strip WFG of its A+ accredited rating, as described above in Paragraphs 81-85; and (2) coordinated calls from individuals purporting to be AARP members to AARP to complain about and/or request the cessation of all WFG advertising in AARP publications, as described in above Paragraphs 86-89.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE SHERMAN ACT, § 1
### PER SE TYING
### (Against All Defendants)

109.   WFG realleges and reasserts the factual allegations in Paragraphs 1-108 as if fully set forth herein.

110.   WFG brings Count I as a private cause of action under the Clayton Act, specifically 15 U.S.C. §15(a), which states in relevant part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States."

111.   This is a cause of action under Section 1 of the Sherman Act, 15 U.S.C. § 1, to restrain anticompetitive conduct by Diamond, and more specifically a claim of *per se* tying.

112.   Diamond is a vertically integrated business which offers the sale of timeshare interests and, in the aftermarket, offers both exits from timeshare contracts and exit services to select, access, and execute the exits.

113.   Diamond offers exits to consumers who have already purchased Diamond timeshares when those owners desire to exit their timeshares.

114.   Diamond engages in exits outside of its Transitions program, whereby it repossesses the timeshare interest by foreclosure or deed in lieu of foreclosure.  In such cases Diamond issues an IRS Form 1099-C to the former owner, reflecting

Diamond's recovery of the timeshare property.  The 1099-Cs list the amount of debt discharged.

115.   Indeed, this resolution is the standard exit in the case of an owner who defaults on their loan, which Diamond typically begins executing approximately 180 days after an owner's delinquency on loan payments.

116.   Because Diamond is in complete control over the exits it offers, it has appreciable market power in the exit products aftermarket for Diamond owners. Indeed, it has 100% of the market share with no other possibility of a competing product. *See Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 481 (1992) (control of 100% of the Kodak parts market).

117.   Diamond also offers exit services for the market of dissatisfied customers to select, access, and execute their exits.

118.   In the exit services market, Diamond competes with other exit service companies, including WFG.

119.   When Diamond offers exit services, its main intent is to increase its own profitability and to ensure that its customers continue paying fees to Diamond. Therefore, Diamond thwarts various exit solutions when it believes that it will lose profits, disregarding consumer preferences and demand.

120.   For example, when a dissatisfied owner seeks an exit from Diamond, Diamond stonewalls the owner with a deceptive and tortuous process designed to

prevent them from exiting or otherwise terminating their timeshare. As just one example, Diamond's customer service representatives have placed callers seeking information about an exit on hold for hours, only to eventually terminate the call and force the owner to start the process over. And when Diamond does offer a solution, it frequently consists of another misrepresentation, *i.e.*, that the owner's problems with their timeshare can be solved by simply upgrading their timeshare to a more expensive one.

121.   Diamond does not permit an exit through Transitions unless it believes that it is in its own financial interest to do so. Diamond actually benefits through its selective availability of exits because it provides a vehicle for Diamond to replace a paid-in-full owner with an owner that has a loan (financed by a Diamond affiliate, of course).

122.   Diamond does not reveal the existence of foreclosure or deed in lieu exits to dissatisfied owners. Further, Diamond does not reveal to dissatisfied owners that as part of a foreclosure exit, Diamond will not seek a deficiency judgment against the owner. Diamond's "service" thus denies access to what is often the most preferred and economically advantageous exit to dissatisfied owners. Instead, Diamond will offer no exit or a different type of exit, with the goal of inducing the owner to continue making payments to Diamond.

123.   WFG is one of several exit companies that competes with Diamond in the exit services industry.

124.   WFG has been a leader in the timeshare exit services industry for over ten years and has helped thousands of families escape onerous timeshare obligations imposed by the unscrupulous players in the industry, including Diamond.

125.   WFG provides assistance to owners who need guidance on how to navigate Diamond's web of deceit and achieve access to and execution of a desired exit.

126.   WFG has tens of thousands of satisfied customers who have successfully been freed from their timeshare obligations, achieving the most desired and economically efficient exit.

127.   The exit product (*e.g.,* deed in lieu, mutual release, quit claim) is sufficiently different from the exit services provided in aid of an exit. The services provided will determine the form of exit, or exit product. Some products are more favorable than others, as are the attendant terms. Some owners choose to work with Diamond's services to access and navigate their exits, but many others seek the services of competing players to guide the exit process.

128.   The demand for exit services apart from exit products is evidenced by the existence of dozens of exit service companies, such as WFG, who provide

services separate from the exit itself (which the exit service companies are powerless to supply). *Kodak*, 504 U.S. at 462.

129.   Diamond refuses to offer its exit products to customers who are working with a competing exit service company. Thus, Diamond insists that a customer seeking to access its exits also engage only in its exit services. Diamond achieves this tie of exits to exit services in several ways. First, it requires some timeshare owners to sign an Affidavit, under penalty of perjury, swearing that the owner has not (1) paid any third party in order to participate in Transitions or otherwise attempt to exit their timeshare; (2) provided their Diamond Resorts credentials or log-in information to any third party for the purpose of facilitating their participation in Transitions; or (3) authorized a third party to pretend to be them.

130.   Diamond not only refuses to engage with a customer who acknowledges the engagement of third-party exit services at the point of sale, but also includes a provision in the Owner's Affidavit requiring the owner to acknowledge that if Diamond Resorts learned that they engaged a third party to help them exit their timeshare, "Diamond Resorts may disqualify [their] application and pursue civil and criminal remedies."

131.   Diamond also has internal policies that tie its exit products to its own exit services. If Diamond learns that an owner is being assisted by a competing exit

service company, it will suspend its normal procedures to ensure that the foreclosure or deed in lieu exits are unavailable to that owner.

132.   Thus, Diamond ties its exit services to its exits by denying access to its exits to those consumers who hire third-party services companies, *Kodak*, 504 U.S. at 476, or by requiring a formal Affidavit stating that the owner is not working with a third-party service provider. *Tie-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1416 (11th Cir. 1987).

133.   Diamond's control over the exit market has thus excluded service competition and forced unwilling consumption of Diamond services, with lower quality services and fewer exits being made available to the market of dissatisfied timeshare owners.

134.   Diamond has harmed WFG and other exit service companies by foreclosing competition, foreclosing sales, and forcing a refund of previously-consummated sales.

135.   The timeshare exit services industry is a multi-million dollar industry, and there is therefore more than an insubstantial effect on interstate commerce.

**COUNT II**
**VIOLATION OF THE SHERMAN ACT**
**RULE OF REASON TYING**
**(Against All Defendants)**

136.   WFG realleges and reasserts the factual allegations in Paragraphs 1-135 as if fully set forth herein.

137.   This is a cause of action under Section 1 of the Sherman Act, 15 U.S.C. § 1, to restrain anticompetitive conduct by Diamond, and more specifically a claim of Rule of Reason tying.

138.   As set forth above, in the aftermarket for Diamond timeshares, Diamond offers both exit products and exit services.

139.   The demand for exit services is separate from the demand for exit products, as evidenced by the timeshare exit services industry.

140.   Diamond has appreciable market power in the exit market.

141.   Indeed, Diamond controls 100% of the market for exits in the aftermarket for Diamond timeshare owners.

142.   Diamond ties the offering of its exit products to its exit services by (i) forcing owners to sign an Affidavit swearing that they are not being assisted by a competing exit service company before Diamond will offer its exits or consummate an exit that it has already offered, and (ii) by preventing Diamond owners from accessing Diamond's exits when it learns that the owner has engaged the services of a competing exit service company.

143.   There is more than an insubstantial effect on interstate commerce, as evidenced by the multi-million dollar exit services industry.

144.   The anticompetitive effect of Diamond's restraint of trade is felt in the sub-competitive output and sub-competitive quality of Diamond's exit services. In

particular, customers are guided to more expensive, less efficient exit products (or convinced to purchase additional products that perpetuate their unwanted timeshare), which lead to their paying continued fees and/or increased fees to Diamond instead of the termination that they desire.

## COUNT III
## VIOLATION OF THE SHERMAN ACT, § 1
## COLLABORATION TO INJURE COMPETITION
### (Against All Defendants)

145.   WFG realleges and reasserts the factual allegations in Paragraphs 1-145 as if fully set forth herein.

146.   This is a cause of action under Section 1 of the Sherman Act, 15 U.S.C. § 1, to restrain anticompetitive conduct by Diamond, and more specifically a claim of collaboration to injure competition.

147.   Diamond, in colluding with other developers, including via ARDA, exerted influence on the BBB to rescind WFG's accreditation and A+ rating.

148.   The concerted effort among timeshare developer competitors was intended to injure the competition for the provision of exit services by destroying the largest third-party provider of exit services.

149.   WFG suffered injury in the form of a downgraded rating and the loss of its accreditation.  Subsequently, on information and belief, ARDA coordinated to have dozens of phone calls made to the AARP on the same day, informing AARP that WFG had lots its BBB rating and complaining that WFG was still allowed to

advertise with AARP. AARP then prohibited WFG from advertising in its publications, which resulted in reduced sales by WFG, estimated to be in the tens of millions of dollars.

150. This collusion among timeshare developer competitors allowed them to continue charging higher fees, erecting obstacles to exit products, and providing diminished services to their locked-in owners.

**COUNT IV**
**VIOLATION OF THE SHERMAN ACT, § 2**
**MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION**

151. WFG realleges and reasserts the factual allegations in Paragraphs 1-150 as if fully set forth herein.

152. This is a cause of action under Section 2 of the Sherman Act, 15 U.S.C. § 2, to restrain anticompetitive conduct by Diamond, and more specifically a claim of monopolization and attempted monopolization.

153. Diamond has monopoly power in the aftermarket for Diamond exits, because it has 100% control over the availability of and access to its exits. Only Diamond can execute an exit from a Diamond timeshare.

154. The commercial reality faced by Diamond timeshare owners who seek an exit is that their sole option is to obtain an exit from Diamond.

155. Diamond attempts to use this monopoly power to foreclose competition and destroy competitors, including WFG.

47

156.   This conduct includes requiring owners to swear in an Affidavit, under penalty of perjury, that they have not and are not working with WFG or another third-party exit company.

157.   This practice of requiring Affidavits puts owners in a less favorable negotiating position and is ultimately aimed at ensuring that no owner is able to obtain a more favorable and efficient exit. Thus, Diamond maintains and increases its monopoly power.

158.   Diamond has no valid business interests in restraining trade in the exit services market. Instead, it uses its power to gain a competitive edge and fill its own coffers with additional fees from unwilling and dissatisfied Diamond timeshare owners.

## COUNT V
## VIOLATION OF FLORIDA ANTITRUST ACT OF 1980
### (Against All Defendants)

159.   WFG realleges and reasserts the factual allegations in Paragraphs 1-158 as if fully set forth herein.

160.   By its conduct described above, Diamond has violated Sections 542.18 and 542.19 of the Florida Antitrust Act of 1980 by conspiring, collaborating, and/or contracting with others to restrain trade or commerce in Florida, by monopolizing or attempting to monopolize, and by unlawfully tying its exit services to its exit product.

161.   WFG seeks relief under the Florida Antitrust Act of 1980, including (a) damages under Fla. Stat. Ann. § 542.22 for Diamond's violation of the Florida Antitrust Act of 1980 and (b) a permanent injunction under Fla. Stat. Ann. § 542.23 to restrain, enjoin, and prohibit further violations by Diamond of the Florida Antitrust Act of 1980.

## COUNT VI
## VIOLATION OF THE FLORIDA DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT
### (Against All Defendants)

162.   WFG realleges and reasserts the factual allegations in Paragraphs 1-161 as if fully set forth herein.

163.   This is a cause of action for damages, declaratory relief, and permanent injunctive relief under Fla. Stat. § 501.211.

164.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is designed to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

165.   WFG is a legitimate business enterprise pursuant to FDUTPA and has been aggrieved, as that term is contemplated under FDUTPA, by the unlawful, deceptive, and unfair acts and practices of Diamond.

166.   WFG's customers are consumers pursuant to FDUTPA.

167.   Diamond is engaged in trade or commerce as those terms are defined in FDUTPA.

168.   The above-described actions of Diamond are unfair methods of competition and otherwise constitute deceptive and unfair business practices that harm consumers, damage WFG's business, cause WFG financial and reputational harm, and which offend public policy. Diamond's violations of FDUTPA include, but are not limited to: the promotion and use of the fraudulent Transitions program and other deceptive relinquishment programs; Diamond's blanket prohibition on timeshare owners using counsel or any third party, including WFG to assist them in exiting their Diamond timeshare; the unconscionable requirement and use of the Owner's Affidavit and documents with similar contractual provisions that prohibit timeshare owners from using counsel or any third party, including WFG, to assist them in negotiating with Diamond and without parity in negotiating power; and Diamond's participation in and weaponization of ARDA to intentionally interfere with WFG's relationships with the BBB and the AARP.

169.   When Diamond owners first purchase their timeshare interests, Diamond does not inform them that they cannot later work with a third party to exit or terminate their timeshares or even to negotiate disputes with Diamond.

170.   By precluding all third-party assistance and by requiring Diamond timeshare owners to sign the Owner's Affidavit or documents with similar

contractual provisions, Diamond arbitrarily discriminates against owners who work with third parties in the exit process and retaliates against them unlawfully and in a manner that offends public policy. In other words, even if Diamond would otherwise allow any given timeshare owner out of his or her timeshare, including for Diamond's own economic benefit, Diamond will refuse to do so for the sole reason that the owner worked with any third party when negotiating with Diamond.

171.  Diamond's blanket prohibition of all third-party assistance deprives Diamond owners the ability to exit or otherwise terminate their unwanted and useless timeshares in contradiction to Diamond's standard business operations.

172.  Diamond fails to disclose to owners in its advertisements that their execution of these onerous and unconscionable Owner Affidavits is a requirement for participating in the Transitions program.

173.  Diamond's participation in and use of ARDA to target WFG also harms consumers. By using ARDA's leverage with the AARP, Diamond successfully blocked WFG from advertising to millions of senior citizens, who are often the primary targets of Diamond's unlawful and deceptive business practices and who need WFG's service the most.

174.  Diamond's Affidavits and other documents with similar contractual provisions that prohibit timeshare owners from using counsel or any third party are further unconscionable, both procedurally and substantively.

175.   Diamond has markedly more bargaining power than a timeshare owner wishing to exit his or her timeshare, as Diamond ultimately decides whether to cancel and/or re-take the owner's timeshare interest. Indeed, by utilizing its disparate negotiating power and prohibiting owners from using third parties to assist them, owners are precluded from discovering information that would help them understand their rights or to even see the truth of Diamond's deception which could be revealed to them. Rather, Diamond—who has a patent conflict of interest with the owners with whom it is in dispute—isolates the owners from anyone who would have a real interest, and ability, in helping them.

176.   Diamond, as one of the largest vacation timeshare developers, possesses far greater sophistication than its owners with respect to the process for purchasing, upgrading and cancelling a timeshare interest.

177.   Diamond is allowed to use third-party assistance, including attorneys, during negotiations with owners.

178.   By prohibiting timeshare owners from working with a third party or engaging counsel, Diamond ensures an information asymmetry that intentionally harms consumers who wish to exit their timeshares.

179.   Diamond's Affidavits and other documents with similar contractual provisions that prohibit timeshare owners from using counsel or any third party are also quintessential contracts of adhesion. These agreements are standardized

contracts given to Diamond timeshare owners who wish to exit their timeshares on a take-it-or-leave-it basis. Diamond does not afford timeshare owners a realistic opportunity to bargain or propose revisions to the agreements.

180.  And as to Diamond timeshare interests that are interests in real property, the Owner's Affidavit and other documents with similar contractual provisions that prohibit timeshare owners from using counsel or any third-party advisors are also unenforceable as unreasonable restraints on alienation of the owner's sovereign right to sell his or her own real property.

181.  WFG is a party aggrieved by Diamond's violations of FDUTPA. As a result of Diamond's unfair methods of competition and its unconscionable, deceptive, and unfair trade practices, WFG customers have terminated their contracts with WFG, directly and proximately causing WFG financial losses.

182.  These actions by Diamond have also caused potential customers to refrain from doing business with WFG and have otherwise caused WFG significant damages.

183.  Diamond's ongoing conduct has caused, and if not permanently enjoined, will continue to cause, irreparable harm to WFG, as well as innocent consumers whom Diamond has retaliated against in order to harm WFG. WFG therefore does not have an adequate remedy at law to fully redress the harm caused by Diamond.

184.   WFG is entitled to recover its attorneys' fees and costs from Diamond under Fla. Stat. §§ 501.2105 and 501.211.

## COUNT VII
## TORTIOUS INTERFERENCE WITH CONTRACTS
## AND ADVANTAGEOUS BUSINESS RELATIONSHIPS
### (Against All Defendants)

185.   WFG realleges and reasserts the factual allegations in Paragraphs 1-184 as if fully set forth herein.

186.   WFG has contractual relationships with customers who own or owned Diamond timeshares. The contracts between WFG and its customers are valid, binding agreements and supported by adequate consideration.

187.   WFG also markets its services to potential customers, timeshare owners (including Diamond timeshare owners) who seek assistance in exiting or terminating their timeshare interests.

188.   WFG and the BBB were previously parties to an accreditation agreement. The accreditation agreement was a valid contract and supported by adequate consideration.

189.   WFG previously had a business relationship with the AARP whereby WFG advertised its services in the AARP's publications. WFG was the first company in the timeshare exit or timeshare industry approved to advertise with the AARP.

190.   Diamond has and had actual knowledge of WFG's contractual and business relationships with its customers, potential customers, the BBB and the AARP.

191.   Diamond used improper and/or illegal means to interfere with WFG's contractual and business relationships.

192.   Diamond's willful and malicious acts include, without limitation: discriminating against and refusing to negotiate or deal with timeshare owners who are working with WFG; the promotion and use of the Transitions program; requiring that Diamond timeshare owners who wish to exit their timeshares sign the Owner's Affidavit or documents with similar contractual provisions; Diamond's blanket prohibition on an owner using any third party, including WFG, to help exit or terminate his or her timeshare; and Diamond's participation in and use of ARDA to interfere with WFG's relationships with the BBB and the AARP.

193.   As a direct and proximate cause of the actions described above, Diamond has successfully caused and/or induced WFG customers to breach and/or terminate their contractual relationships with WFG before those contracts expired. Diamond's intentional interference has also caused potential customers to refrain from doing business with WFG and has otherwise caused WFG significant monetary damages.

194.   Also, as a direct and proximate cause of ARDA's interference, which acted as Diamond's agent, the BBB revoked WFG's accreditation, in violation of the parties' accreditation agreement, and the AARP terminated WFG's ability to advertise in its publications. These actions likewise caused WFG significant monetary damages.

195.   Diamond is a stranger to the contractual and business relationships between WFG and its customers, potential customers, the BBB and the AARP, and Diamond has no justification or privilege to procure the breaches and interference described above.

196.   Diamond used improper and/or illegal means to interfere with WFG's contractual and business relationships.

197.   Diamond's ongoing conduct has caused, and if not permanently enjoined, will continue to cause, irreparable harm to WFG due to the disruption of WFG's contractual and business relations with its customers, potential customers, the AARP and the BBB. Therefore, WFG does not have an adequate remedy at law to fully redress the harm caused by Diamond.

198.   Diamond's actions were done with an improper motive and not in good faith. Diamond's interference was calculated to harm WFG, hinder its ability to assist its customers, drive WFG out of business and, upon information and belief, gain an unfair advantage over WFG in litigation.

199.   Diamond's conduct is intentional and willful and entitles WFG to an award of punitive damages.

## COUNT VIII
## CIVIL CONSPIRACY
### (Against All Defendants)

200.   WFG realleges and reasserts the factual allegations in Paragraphs 1-199 as if fully set forth herein.

201.   This is a cause of action for civil conspiracy by and among all Defendants.

202.   All Defendants are parties to the conspiracy and have acted in concert with their co-conspirator, ARDA, to tortiously interfere with WFG's contractual and business relationships with the BBB, AARP, and WFG's customers, including bringing the present lawsuit against WFG—all designed to destroy WFG's business. Diamond and ARDA, as conspirators, devised a common scheme and knowingly and intentionally conspired with one another to accomplish unlawful ends and/or to accomplish lawful ends by unlawful means.

203.   Diamond's unlawful and fraudulent behavior harming WFG described herein was done in concert and in furtherance of its conspiracy to destroy WFG's business.

204.   Furthermore, as described herein, Diamond and ARDA have committed overt acts in furtherance of the conspiracy. In addition, Diamond and

ARDA have used ARDA's meetings to devise a plan to shut down WFG's business; engaged in a pressure campaign against WFG with the BBB and the AARP to accomplish their plan; and published media and press releases designed to portray timeshare exit companies, like WFG, as fraudulent and illegitimate.

205.   As a direct and proximate cause of the concerted actions described above, the BBB revoked WFG's accreditation and no longer offers accreditation to any timeshare exit business in the BBB's territory. Further, the AARP terminated WFG's ability to advertise in the AARP's publications as a natural and direct consequence of BBB's revocation of WFG's accreditation, preventing WFG from advertising to many senior citizens. These actions likewise caused WFG significant monetary damages.

206.   Diamond and ARDA have financial motives and incentives to accomplish their conspiracy, and they permitted, encouraged, induced and/or ratified the other co-conspirators' wrongful and tortious actions described herein.

207.   Diamond's conduct is intentional and willful and entitles WFG to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, WFG respectfully requests that the Court enter a judgment for WFG and against Diamond as follows:

1. Finding that Diamond's conduct described above violates Sections 1 and 2 of the Sherman Act;

2. Finding that Diamond's business practices described above constitute violations of FDUTPA;

3. Permanently enjoining Diamond from engaging in the above-described conduct and further violations of FDUTPA;

4. Finding that Diamond tortiously interfered with WFG's contracts with its customers;

5. Permanently enjoining Diamond from engaging in further tortious interference of WFG's contracts with its customers;

6. For actual damages, consequential damages (including lost profits), incidental damages, punitive damages and/or other damages the jury and/or Court deems appropriate;

7. For pre- and post-judgment interest;

8. For attorneys' fees, court costs, and all other properly awardable expenses and costs associated with the prosecution of this action; and

9. For such other and further relief to which WFG shows it is justly entitled at law or in equity.

## DEMAND FOR A JURY TRIAL

WFG demands a trial by jury on all issues so triable.

Respectfully submitted this 8th day of December, 2023.

/s/ *John J. Bennett*
John J. Bennett, Esq.
Florida Bar No: 98257
Paul N. Mascia, Esq.
Florida Bar No: 0489670
**NARDELLA & NARDELLA, PLLC**
135 W. Central Blvd., Suite 300
Orlando, Florida 32801
Telephone: (407) 966-2680
Facsimile: (407) 966-2681
pmascia@nardlellalaw.com
jbennett@nardellalaw.com

&

Patrick A. Bradford, Esq. (request for
admission *pro hac vice* forthcoming)
**BRADFORD EDWARDS LLP**
12 East 49th Street, 11th Floor
New York, NY 10017
Office: (917) 671-9406

***Counsel for Wesley Financial
Group, LLC***