# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| WESLEY FINANCIAL GROUP, LLC, <br><br> Plaintiff, <br><br> v. <br><br> DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC, DIAMOND RESORTS HAWAII COLLECTION DEVELOPMENT, LLC, and DIAMOND RESORTS MANAGEMENT, INC., <br><br> Defendants. | Case No.: 6:23-cv-02361-CEM-DCI |

# MEMORANDUM IN SUPPORT OF
# DIAMOND'S MOTION TO DISMISS

## TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ......................................................................................................... 2

STANDARD OF REVIEW .......................................................................................... 5

ARGUMENT .............................................................................................................. 5

I.   WFG Fails to State a Claim for Tying (Counts I and II) .................................. 5

    A.   WFG Fails to Allege a Relevant Antitrust Market. ................................... 6

        1.   A Relevant Market Cannot Be Based on Contract Restrictions. ................ 7
        2.   WFG Does Not Allege a "Submarket". ..................................................... 9
        3.   WFG Does Not Allege a Single-Brand Market under *Kodak*. .................. 10

    B.   WFG Does Not Plausibly Allege Separate Products or a Conditioned
        Purchase. ................................................................................................ 13

II.  WFG Fails to State a Claim for Monopolization or Attempted Monopolization (Count
    IV) ............................................................................................................... 15

III. WFG Fails To State a Cause of Action for Collaboration to Injure Competition (Count
    III) .............................................................................................................. 17

IV.  WFG Fails to State Any Claims under Florida Law ...................................... 19

    A.   Florida Antitrust Claim (Count V) .......................................................... 19

    B.   Florida Deceptive and Unfair Trade Practices Act (Count VI) ................. 20

    C.   Tortious Interference (Count VII) ............................................................ 23

    D.   Civil Conspiracy (Count VIII) ................................................................ 25

CONCLUSION ........................................................................................................ 26

LOCAL RULE 3.01(g) CERTIFICATION ................................................................ 27

CERTIFICATE OF SERVICE ................................................................................... 28

i

<u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Ahern v. Boeing Co.*,
701 F.2d 142 (11th Cir. 1983)................................................................. 24

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*,
135 F.3d 740 (11th Cir. 1998)................................................................. 20

*Altamonte Pediatric Assocs., P.A. v. Greenway Health, LLC*,
No. 8:20-cv-604-VMC-JSS, 2020 WL 5350303 (M.D. Fla. Sept. 4, 2020).......... 22

*American Dental Ass'n v. Cigna Corp.*,
605 F.3d 1283 (11th Cir. 2010).......................................................... 18, 19

*Amey, Inc. v. Gulf Abstract & Title, Inc.*,
758 F.2d 1486 (11th Cir. 1985).......................................................... 5, 6, 15

*Aquatherm Industries, Inc. v. Florida Power & Light Co.*,
145 F.3d 1258 (11th Cir. 1998)................................................................. 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................. 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................. 5

*Brooks v. Blue Cross and Blue Shield of Florida, Inc.*,
116 F.3d 1364 (11th Cir. 1999)................................................................. 2

*Brown Shoe v. United States*,
370 U.S. 294 (1962) ................................................................................. 9

*Digital Equip. Corp. v. Uniq Digital Technologies, Inc.*,
73 F.3d 756 (7th Cir. 1996) ..................................................................... 12

*Eastman Kodak Co. v. Image Tech. Servs.*,
504 U.S. 451 (1992) .................................................................. 10, 11, 12, 13

*Epic Games, Inc. v. Apple, Inc.*,
67 F. 4th 946 (9th Cir. 2023) ................................................................... 12

4862-5196-5090.v1

*Fidelity Nat'l Fin., Inc. v. Attachmate Corp.*,
   No. 3:15-cv-1400-HES-PDB, 2017 WL 3726687 (M.D. Fla. Mar. 1, 2017) ....... 22

*Garcia v. Santa Maria Resort, Inc.*,
   528 F.Supp.2d 1283 (S.D. Fla 2007) ................................................................ 21

*General Cigar Holdings, Inc. v. Altadis, S.A.*,
   205 F. Supp. 2d 1335 (S.D. Fla. 2002) ............................................................ 13

*Genet Co. v. Annheuser–Busch, Inc.*,
   498 So.2d 683 (Fla. 3d DCA 1986) .................................................................. 23

*Haynes v. Wilder Corp. of Delaware*,
   721 F.Supp.2d 1218 (M.D. Fla. 2010) .............................................................. 25

*Illinois Tools Works Inc. v. Independent Ink, Inc.*,
   547 U.S. 28 (2006) ............................................................................................. 6

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ........................................................................................ 5, 14

*JES Properties, Inc. v. USA Equestrian, Inc.*,
   253 F. Supp. 2d 1273 (M.D. Fla 2003) .............................................................. 6

*Lee v. Life Ins. Co. of N. Am.*,
   23 F.3d 14 (1st Cir. 1994) ........................................................................... 11, 12

*Maris Distributing Co. v. Anheuser-Busch, Inc.*,
   302 F.3d 1207 (11th Cir. 2002) ......................................................................... 7

*Metzler v. Bear Automotive Service Equip. Co.*,
   19 F. Supp. 2d 1345 (S.D. Fla. 1998) ......................................................... 10, 16

*N.A.A.C.P. v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982) ......................................................................................... 23

*Newcal Industries, Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ............................................................. 6, 7, 9, 12

*Orange Lake Country Club, Inc. v. Reed Hein & Associates, LLC*,
   367 F. Supp. 3d 1360 (M.D. Fla. 2019) ........................................................... 25

*PB Property Management, Inc. v. Goodman Mfg. Co.*,
   No. 3:12-cv-1366-J-20JBT, 2013 WL 12172912 (M.D. Fla. Aug. 28, 2013) ....... 22

4862-5196-5090.v1

*PSI Repair Services, Inc. v. Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997) ........................................................................ 12

*Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*,
    917 F.3d 1249 (11th Cir. 2019) ...................................................................... 5

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ................................................................... *passim*

*Raney v. Aware Woman Center for Choice, Inc.*,
    224 F.3d 1266 (11th Cir. 2000) .................................................................... 25

*Rollins, Inc. v. Butland*,
    951 So.2d 860 (Fla. 2d DCA 2006) .............................................................. 22

*Rudnick v. Sears*,
    358 F. Supp. 2d 1201 (S.D. Fla. 2005) ......................................................... 24

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*,
    742 So.2d 381 (Fla. 4th DCA 1999) ............................................................. 23

*SFM Holdings, Ltd. v. Banc of America Securities, LLC*,
    764 F.3d 1327 (11th Cir. 2014) .................................................................... 25

*Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc.*,
    376 F.3d 1065 (11th Cir. 2004) ............................................................... 17, 18

*T. Harris Young & Assocs., Inc. v. Marquette Electronics, Inc.*,
    931 F.2d 816 (11th Cir. 1991) ................................................................. 15, 16

*Thompson v. Metropolitan Multi–List, Inc.*,
    934 F.2d 1566 (11th Cir.1991) ...................................................................... 6

*Turner v. Williams*,
    65 F.4th 564 (11th Cir. 2023) ...................................................................... 26

*U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*,
    7 F.3d 986 (11th Cir. 1993) ......................................................................... 15

*Westgate Resorts, Ltd. v. Wesley Financial Group, LLC*,
    No. 3:20-cv-00599, 2023 WL 5062065 (M.D. Tenn. Aug. 8, 2023) .................... 3

*Wyndham Vacation Ownership, Inc. v. Montgomery Law Firm, LLC*,
    No. 8:19-cv-1895-CEH-CPT, 2021 WL 4948151 (M. D. Fla. Oct. 18, 2021) ..... 18

iv

*Zlotnick v. Premier Sales Group, Inc.*,
    480 F.3d 1281 (11th Cir. 2007)....................................................................20, 21

## Statutes and Codes

Florida Statutes
    Section 542.32 (Florida Antitrust Act)............................................................ 20

Sherman Antitrust Act
    15 U.S.C. § 1 et seq........................................................................................ 19

## Rules and Regulations

Federal Rules of Civil Procedure
    Rule 9(b) ......................................................................................................... 22
    Rule 12(b)(6) .................................................................................................... 5

## Other Authorities

IX Areeda & Hovencamp, Antitrust Law ¶ 1720 (4th ed. 2018)............................. 6

4862-5196-5090.v1

Defendants (collectively "Diamond") respectfully move this Court to dismiss the First Amended Complaint ("FAC" or "Complaint") of Plaintiff Wesley Financial Group, LLC ("WFG") in its entirety.

## PRELIMINARY STATEMENT

WFG, whose business is advising timeshare owners how to break their timeshare contracts, has sued Diamond, a timeshare company.  Diamond sells timeshare interests pursuant to contracts that require Diamond's consent to any resale or transfer of those interests.  If Diamond's timeshare owners wish to dispose of their interests, they can work with Diamond to do so, including through a Diamond program called Transitions.  But some such owners, instead of working directly with Diamond, engage with "timeshare exit companies" like WFG.  WFG advises its clients in secret, doing nothing more than instructing clients to default on their timeshare payments.

WFG's Complaint raises two basic claims under a variety of legal theories.  First, in a tortured attempt to state antitrust claims, WFG contends that Diamond's Transitions program competes unfairly with WFG's "exit services."  WFG argues: 1) that the various legal procedures for ending a timeshare owner's contractual relationship with Diamond, such as a mutual release or foreclosure, are "products;" 2) that Diamond "sells" these "products" into a "market" limited to its own customer base, in which by definition it has a monopoly; and 3) that Diamond uses this supposed monopoly power to gain unfair advantage in the "exit services"

1

market, all giving rise to antitrust claims for tying and monopolization. Settled antitrust law refutes this reasoning at every step.

Second, WFG alleges that a trade association of timeshare companies has interfered with WFG's business by causing it to lose its credit rating and its access to advertising. But WFG has not sued the trade association. It sues only Diamond, one of 350 members of the trade association, and alleges in conclusory fashion, without supporting facts, that the association is Diamond's agent or co-conspirator.

None of WFG's allegations state a claim. They are deficient as a matter of law and do not begin to satisfy federal pleading standards. Accordingly, the Complaint should be dismissed in its entirety.

## BACKGROUND

Pursuant to written Purchase and Security Agreements, Diamond sells timeshare interests or Memberships. FAC ¶ 97; Ex. A.[1] These Memberships include a lifetime right to use Diamond vacation properties, but not any interest in real property. Ex. A, ¶ 1. Members are required to obtain Diamond's approval to sell or transfer their Memberships. *Id.* ¶ 3. The Agreement expressly informs Members that "Diamond does not currently offer a resale, buyback or rental program and does not assist with third party transfers." *Id.* Members agree they are purchasing the Membership for personal use, not as an investment or for resale. *Id.*, p. 2.

---

[1] Attached as Exhibit A is a true and correct copy of a sample Diamond Purchase and Security Agreement. *See* FAC at ¶¶ 4, 25, 30. When a complaint refers to documents that are central to the plaintiff's claim, the court may consider the documents part of the pleadings. *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1999).

4862-5196-5090.v1

The Complaint alleges that Diamond uses misleading and high-pressure tactics to sell timeshare interests (FAC ¶¶ 22-41), but these are not claims that WFG has any standing to litigate.  WFG is a "timeshare exit company," whose business is "helping timeshare owners get rid of unwanted timeshares"—*i.e.*, "confidential[ly]" advising Diamond members how to break their contracts with Diamond.  *Id.* ¶¶ 3, 46.  Diamond and other timeshare companies have challenged the unlawful practices of timeshare exit companies, including WFG, through recent litigation.  *Id.* ¶ 6; *see, e.g.*, *Westgate Resorts, Ltd. v. Wesley Financial Group, LLC*, No. 3:20-cv-00599, 2023 WL 5062065 (M.D. Tenn. Aug. 8, 2023) (describing WFG's unauthorized practice of law and misleading offering of credit repair services).

WFG's claims against Diamond sound primarily in antitrust.  Although its antitrust market allegations are abstruse and internally inconsistent, WFG asserts that "[t]he relevant antitrust market is for the provision of exit services to Diamond customers who desire an exit from their timeshare contracts."  *Id.* ¶ 95.  Diamond allegedly competes with WFG in this exit services "market" by offering its own Members ways "to select, access, and execute their exits."  *Id.* ¶¶ 118-119, 124.  WFG also alleges there is a timeshare exit "product" market, consisting of products such as a "mutual release, deed in lieu of foreclosure, deed back, charge off, purchaser's default, or foreclosure."  *Id.* ¶48; *see also id.* ¶¶ 103, 128.  But obviously, these are not "products" that anyone sells at all; they are different legal procedures that contracting parties, like Diamond and its Members, could use to modify or end a contractual relationship.

According to WFG, Diamond offers "exit services" through its Transitions program, which it allegedly developed "[a]fter seeing the success of WFG." *Id.* ¶ 50. As a condition of participation in the Transitions program, Members must sign an affidavit confirming (among other things) that they have not authorized any third party to use their Diamond credentials or log-in information or otherwise pretend to be them, and that they have not paid any third party to participate in the Transitions program or otherwise exit their timeshare. *Id.* ¶¶ 63-64, 130. The FAC alleges that Diamond "engages in exits outside of its Transitions program, whereby it repossesses the timeshare interest by foreclosure or deed in lieu of foreclosure." *Id.* ¶ 115.

The Complaint further alleges that the American Resort Development Association ("ARDA"), a trade association of participants in the timeshare industry, took various steps to interfere with WFG's business. *Id.* ¶ 75. This included persuading the Better Business Bureau (the "BBB") to revoke WFG's accreditation and rating (*id.* ¶¶ 81-85, 154); pressuring the American Association of Retired People (the "AARP") not to publish WFG's advertisements in their magazine (*id.* ¶¶ 86-91, 156); and persuading Paypal to stop doing business with WFG (*id.* ¶ 92). The Complaint does not allege that Diamond was involved in any of these actions. It alleges only, without specific facts and "[u]pon information and belief," that "ARDA engaged in the above actions on behalf of Diamond, with Diamond's knowledge and within the scope of its agency with Diamond." *Id.* ¶ 94.

4862-5196-5090.v1

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), the allegations must state a claim for relief that is plausible, not merely possible. *Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (a complaint may be dismissed if the facts as pled do not "state a claim for relief that is plausible on its face.")  The court must accept as true all well-pled factual allegations in the complaint but is not required to accept a plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I.    WFG Fails to State a Claim for Tying (Counts I and II)

WFG brings two tying claims—"per se" tying and Rule of Reason tying—under Section 1 of the Sherman Act.  "A tying arrangement is an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir. 1985) (citation omitted).  "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).  The Eleventh Circuit has broken a tying claim into five elements:

> (1) a tying and a tied product; (2) evidence of actual coercion by the seller that in fact forced the buyer to purchase the tied product; (3) that the seller have sufficient market power in the tying product market to force the buyer to

accept the tied product; (4) anticompetitive effects in the tied market; and (5) involvement of a not insubstantial amount of interstate commerce in the tied product market.

*Amey*, 758 F.2d at 1502-03 (cleaned up).  "A claim that a tying arrangement is illegal per se eliminates [the fourth element]." *Id.*[2]

Here, both of WFG's tying claims rest on the same essential allegations: the "relevant antitrust market" is "Diamond customers who desire an exit from their timeshare contracts"; the "tying products" are "exit products" for Diamond owners, including foreclosures, deeds in lieu of foreclosure, mutual releases, or quitclaim deeds; and the "tied product," is Diamond's "exit service," the Transitions program. FAC ¶¶ 95, 128.

### A.    WFG Fails to Allege a Relevant Antitrust Market.[3]

In order to state a tying or monopolization claim under the Sherman Act, "a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market."  *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008).  WFG alleges that the "relevant antitrust market" is "Diamond customers who desire an exit from their timeshare

---

[2]  The premise that tying can be a *per se* violation of the Sherman Act, without a showing of anticompetitive effects, has been sharply criticized.  *See*, *e.g.,* IX Areeda & Hovenkamp, Antitrust Law ¶ 1720 (4th ed. 2018).  The Supreme Court moved away from it, but did not expressly abandon it, in *Illinois Tools Works Inc. v. Independent Ink, Inc.,* 547 U.S. 28, 35-38 (2006).  This Court need not address that issue, because WFG fails the first three requirements.

[3]  "Markets are defined in terms of two separate dimensions: products and geography."  *Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, 1572 (11th Cir.1991). The FAC does not contain any allegations regarding the relevant geographic market.  This failure alone is grounds for dismissal.  *See JES Properties, Inc. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1282 (M.D. Fla 2003).

6

4862-5196-5090.v1

contracts," and that Diamond has "100% market share" in the "exit products aftermarket for Diamond owners."  FAC ¶ 95, 117.  This assertion – that Diamond has a 100% share of its own customer base – is a tautology, not a market definition.

1.  **A Relevant Market Cannot Be Based on Contract Restrictions.**

Economic power derived from contractual restrictions does not equate to antitrust market power, and a relevant market cannot be limited to contracting parties who knowingly agree to restrictions in their contract.  *Maris Distributing Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1219-22 (11th Cir. 2002); *see also Newcal Industries,* 513 F. 3d at 1048 ("The law prohibits an antitrust claimant from resting on market *power* that arises solely from contractual rights that customers knowingly and voluntarily gave to the defendant." [original emphasis]).

In *Maris*, the plaintiff alleged that Anheuser-Busch unreasonably restrained competition in the "relevant submarket for the purchase and sale of equity ownership interests in Anheuser-Busch beer distributorships" by prohibiting sales of such distributorships to public companies.  302 F.3d at 1211.  The Eleventh Circuit agreed that Anheuser-Busch's decision to enforce provisions in the distributorship agreements did not constitute an exercise of antitrust market power.  *Id*. at 1222.

> The fact that Anheuser-Busch had considerable power over many aspects of [the plaintiff's] business by virtue of the provisions of the contract to which they agreed . . . reveals little about the broader, relevant market for the purchase and sale of equity ownership interests in beer distributorships.

*Id.*

The *Maris* court relied heavily on *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,

7

where the Third Circuit held that "the particular contractual restraints assumed by a plaintiff are not sufficient by themselves" to establish a relevant market.  124 F.3d 430, 443 (3d Cir. 1997).

In the present case, the FAC expressly alleges that the Purchase and Security Agreement signed by Diamond customers "by its terms, lasts a lifetime."  FAC ¶ 25. The Agreements state that Diamond has no obligation to buy back timeshare interests or agree to release Members from their timeshare interests, and that any sales of the interest must be approved by Diamond.  Ex. A, ¶ 3.  In other words, the alleged lifetime contract that Members entered into gives Diamond substantial control over the Member's ability to exit the contract.  That Diamond has developed a program, Transitions, to assist with releasing some timeshare owners from their interests at Diamond's contractually-held discretion, does not mean that Diamond has improperly exercised market power within the meaning of antitrust law.  To paraphrase *Queen City Pizza*, a Member's acceptance of a Purchase and Security Agreement "that included purchase requirements and contractual restrictions is consistent with the existence of a competitive market in which [timeshares] are valued, in part, according to the terms of the proposed [timeshare] agreement and the availability of alternative [timeshare] opportunities."  124 F.3d at 441.  If those contractual restrictions "were viewed as overly burdensome or risky at the time they were proposed, plaintiffs could have purchased a different form of [timeshare], or made some alternative investment. They chose not to do so."  *Id.*

2.      **WFG Does Not Allege a "Submarket."**

WFG argues that each timeshare developer's alleged market for the provision

of exit services to its own customers is an example of what is "referred to in some of

the antitrust literature [as a] submarket."  FAC ¶ 95.  However, to plead an antitrust

claim based on a "submarket," a plaintiff must establish that the submarket is

"economically distinct from the general product market."  *Newcal Industries*, 513 F.3d

at 1045.  The Supreme Court has listed several "practical indicia" of an economically

distinct submarket: "'industry or public recognition of the submarket as a separate

economic entity, the product's peculiar characteristics and uses, unique production

facilities, distinct customers, distinct prices, sensitivity to price changes, and

specialized vendors.'"  *Id*. (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325

(1962)).  The FAC does not identify any such indicia in the alleged single-brand

"submarket" of "Diamond customers who desire an exit from their timeshare

contracts."  Rather, the FAC acknowledges a much broader competitive market for

timeshares and exit services, in which Diamond is one competitor.  FAC ¶ 95, 97.

In *Queen City Pizza*, Domino's Pizza required its franchisees to purchase fresh

dough from Domino's, and then allegedly "used its power in the purported market

for Domino's-approved dough to force [the franchises] to buy [other] unwanted

ingredients and supplies from them." 124 F.3d at 442-443.  The court held:

> This claim fails because the proposed tying market—the market in Domino's-
> approved dough—is not a relevant market for antitrust purposes. Domino's dough
> is reasonably interchangeable with other brands of pizza dough, and does not
> therefore constitute a relevant market of its own.  All that distinguishes this dough
> from other brands is that a Domino's franchisee must use it or face a suit for breach

of contract.

*Id.* at 443.

In other words, the court rejected the franchisees' theory that Domino's 100% share of the market of "Domino's-approved" dough constituted a relevant antitrust market. The relevant antitrust market must include all types of pizza dough, not just the dough Domino's franchisees were contractually obligated to use.  Likewise, here, the allegation that Diamond has "100% of the market share with no other possibility of a competing product" because "Diamond is in complete control over the exits it offers" (FAC ¶ 117) does not state an economically distinct antitrust "submarket"—it simply describes the contractual relationship between Diamond and its members.

### 3. **WFG Does Not Allege a Single-Brand Market under *Kodak*.**

WFG hopes to fit its allegations of a single-brand aftermarket into the holding of *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992), which is cited several times in the FAC.  FAC ¶ 117, 129, 133.  But courts interpreting *Kodak* have uniformly held that single-brand aftermarkets are the rare exception, and WFG has come nowhere close to demonstrating how it fits within that exception.

Because it would make no economic sense to punish a firm for having a natural monopoly in its own products, "courts embraced a sweeping prohibition against analyzing alleged anticompetitive activity by focusing on single-brand relevant markets."  *Metzler v. Bear Automotive Service Equip. Co.*, 19 F. Supp. 2d 1345, 1355 (S.D. Fla. 1998).  Absent "exceptional market conditions," one brand in a market of competing brands cannot constitute a relevant market.  *Id.*

4862-5196-5090.v1

*Kodak* sets the bar for these "exceptional" circumstances.  In that case, Kodak tied repair services for its machines to replacement parts.  *Id*. at 458.  However, it did so by ending its policy of selling replacement parts to independent repair servicers, and adopting a new policy in which Kodak only sold replacement parts to Kodak machine owners who used Kodak's repair services or performed self-service.  *Id.*

In holding that Kodak was not entitled to summary judgment, the Supreme Court emphasized that Kodak had changed its policy regarding sales of replacement parts to independent servicers after its customers were already "locked in" to their purchase of Kodak equipment.  *Id*. at 476-477.  Whether Kodak's restrictive replacement parts policy was "generally known" to consumers at the time they purchased the equipment was "crucial" to the analysis.  *Id*. at 477 n.24.  If it was, consumers could factor that restriction into their original decision whether to purchase Kodak equipment, or a competing brand that offered lower service costs, in the competitive equipment market.  *See id.* at 465-466.  But once the buyer was locked in to Kodak's equipment, their costs of switching gave Kodak leverage to increase service costs, and to that extent to exercise power in the aftermarket comprising its own customer base.  *Id.* at 476.

Subsequent cases applying *Kodak* have recognized that "the *timing* of the lock-in at issue in *Kodak* was central to the Supreme Court's decision."  *Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 20 (1st Cir. 1994) (original emphasis).

> Had previous customers known, at the time they bought their Kodak
> copiers, that Kodak would implement its restrictive parts-servicing

> policy, Kodak's "market power," *i.e.,* its leverage to induce customers
> to purchase Kodak servicing, could only have been as significant as its
> [market power] in the *copier market*, which was stipulated to be
> inconsequential or nonexistent.

*Id*. (original emphasis); *accord Digital Equip. Corp. v. Uniq Digital Technologies, Inc.*, 73

F.3d 756, 763 (7th Cir. 1996) ("the material dispute … was whether the change in

policy enabled Kodak to extract supra-competitive prices from customers who had

already purchased its machines"); *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d

811, 820 (6th Cir. 1997) ("the change in policy in *Kodak* was the crucial factor in the

Court's decision"); *Newcal Industries,* 513 F.3d at 1048 (the "critical distinction" was

that "Kodak customers did not knowingly enter a contract that gave Kodak the

exclusive right to provide parts and services for the life of the equipment").  Most

recently, in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023), the Ninth

Circuit held that "to establish a single-brand aftermarket, a plaintiff must show,"

among other things, that "the challenged aftermarket restrictions are 'not generally

known' when consumers make their foremarket purchase."

Here, WFG does not allege that Diamond **changed** its exit policies to the

Members' disadvantage after they were "locked in," or that the restrictions on exiting

a timeshare interest were not "generally known" to Members before they made their

timeshare purchases.  Rather, the FAC alleges that Diamond's contract "by its terms,

lasts a lifetime."  FAC ¶ 27.  As noted above, the Diamond Agreement expressly

provides that "Diamond does not currently offer a resale, buyback or rental program

and does not assist with third party transfers."  Ex. A, ¶ 3.  Thus, rather than

imposing new restrictions or costs beyond what the Members agreed to at the time of contracting, Diamond (through the Transitions program) gave the members an additional option, beyond what the Agreement required, to terminate their membership. *Kodak* has no application here.

**B.    WFG Does Not Plausibly Allege Separate Products or a Conditioned Purchase.**

Beyond the threshold market definition failures, WFG does not plausibly allege either of the first two elements of a tying claim: the existence of separate tying and tied products; or that Diamond forced its Members to purchase the tied product.

*First*, WFG alleges that "exits from [Diamond] timeshare contracts" (*i.e.*, the "exit products") are a separate product from "exit services," and that Diamond's Members are forced to purchase the latter in order to obtain the former.  FAC ¶¶ 113, 128-130.  But the right to sell or otherwise dispose of a timeshare interest is not a separate "product;" it is simply part of the package of rights the Diamond timeshare owner obtains when he or she initially purchases a Diamond timeshare interest. Moreover, the Complaint does not explain how Diamond "sells" "exit product[s] such as a mutual release, deed in lieu of foreclosure, deed back, charge off, purchaser's default, or foreclosure."  FAC ¶ 48.  That is because these are not "products" but rather different legal procedures for terminating a Member's contractual relationship with Diamond.  It is absurd for WFG to suggest, for example, that a Member defaulting on their timeshare interest payments is a "product" that Diamond "sells."  *See General Cigar Holdings, Inc. v. Altadis, S.A.*, 205

F. Supp. 2d 1335, 1355 (S.D. Fla. 2002) (no tying claim is stated where defendant could not actually sell the product, because "tying is the process of conditioning the *sale* of one product on the *sale* of another." [emphasis in original]).

*Second*, even where a transaction involves separate products, it is not necessarily a tie; the seller must also "*force* the buyer into the purchase of a tied product … ." *Jefferson Parish Hosp. Dist. No. 2,* 466 U.S. at 12 (emphasis added). WFG alleges that "the most preferred and economically advantageous exit [for] dissatisfied owners" is often foreclosure, where the owner walks away and Diamond does not seek a deficiency judgment. *Id.* ¶ 123.  But WFG does not (and could not plausibly) allege that Diamond conditions a "sale" of this "exit product" on the Member's "purchase" of Transitions.  To the contrary:  the FAC expressly alleges that "***Diamond engages in exits outside of its Transitions program, whereby it repossesses the timeshare interest by foreclosure … .***"  FAC ¶ 115 (emphasis added).  WFG thereby concedes that the Transitions program is ***not*** tied to the "most preferred and economically advantageous exit product."  Even if Diamond "does not reveal the existence of foreclosure or deed in lieu exits to dissatisfied owners" (*id*. ¶ 123), it does not follow that Members are forced to use the Transitions to exit their timeshares.

The FAC also alleges that "[s]ome owners choose to work with Diamond's services to access and navigate their exits, but many others seek the services of competing players to guide the exit process," and that many Diamond Members can and have obtained an "exit" from their timeshares by working with exit companies,

14

including WFG.  FAC ¶ 125-128.  In fact, the FAC alleges: "WFG has tens of thousands of satisfied customers who have successfully been freed from their timeshare obligations…"  FAC ¶ 126.  Because, as the FAC acknowledges, Transitions is only one means by which Members can exit their timeshares, WFG cannot plausibly allege "actual coercion by [Diamond] that in fact forced the buyer to purchase the tied product."  *Amey*, 758 F. 2d at 1503.

## II.  WFG Fails to State a Claim for Monopolization or Attempted Monopolization (Count IV)

Count IV of the FAC asserts, in conclusory fashion, a single claim under Section 2 of the Sherman Act for both monopolization and attempted monopolization.  WFG's theory is that: Diamond has a monopoly in "the aftermarket for Diamond exits" (FAC ¶¶ 160-161); it "maintains and increases its monopoly power" through the affidavits required to participate in the Transitions program (*id* ¶¶ 163-164); and it "use[s] this monopoly power to foreclose competition" from WFG and others in the "exit services market" (*id*. ¶¶ 162, 165).

These claims collapse for the same reasons as WFG's tying claims.  Claims under Section 2 of the Sherman Act must begin from a plausible market definition, which WFG has not and cannot allege.  *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 F.3d 986, 994 (11th Cir. 1993) ("Defining the market is a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization or attempt case arising under section 2"); *T. Harris Young & Assocs., Inc. v. Marquette Electronics, Inc.*, 931 F.2d 816, 823 (11th Cir. 1991) ("Where

4862-5196-5090.v1

there is no Market, there is no Monopoly").  In *Queen City Pizza*, the plaintiffs'

"failure to plead a valid relevant market" for Domino's-approved ingredients and

supplies defeated their monopolization and attempted monopolization claims, as

well as their tying claims.  124 F.3d at 437-443; *Metzler*, 19 F. Supp. 2d at 1363

(having failed, for purposes of a tying claim, to show the existence of a single-brand

relevant market or power in the interbrand market, "[t]he plaintiffs therefore cannot

prove their section 2 claim").

There are other problems with WFG's Section 2 claims.  For example, even

where the defendant has monopoly power in a properly defined market, an essential

element of a monopolization claim is "the willful acquisition or maintenance of that

power as distinguished from growth or development as a consequence of a superior

product, business acumen, or historic accident."  *T. Harris Young & Assocs.*, 931 F.2d

at 823 (citation omitted).  WFG, however, alleges that Diamond acquired its

"monopoly power in the aftermarket for Diamond exits" simply by entering into

lifetime contracts with its Members.  FAC ¶¶ 97, 117, 141-142, 150, 153, 160-161.

Although WFG alleges deceptive and unfair practices in promoting the timeshares, it

does not contend that the lifetime contracts, which are the source of Diamond's

supposed monopoly power, were themselves anticompetitive.  In particular, the

affidavits for the Transitions program, whatever effect they may have in the exit

*services* market, could not have "maintain[ed] and increase[d] [Diamond's] monopoly

power" in the *exit* "market."  (FAC ¶ 164).  *Compare Aquatherm Industries, Inc. v.*

*Florida Power & Light Co.*, 145 F.3d 1258, 1261 (11th Cir. 1998) ("there exists no

16

allegation that [the defendant's] actions increased its market share in the electric power market (which, as a regulated monopoly, stands at 100%")).

### III.   WFG Fails To State a Cause of Action for Collaboration to Injure Competition (Count III)

WFG alleges in Count III that Diamond collaborated with other unnamed timeshare developers and ARDA to "injure competition" in violation of Section 1 of the Sherman Act.  WFG does not allege an agreement to fix prices or allocate markets or customers, or any other *per se* violation of Section 1.  The alleged collaboration must therefore be analyzed under the rule of reason, which requires consideration of "'whether the questioned practice imposes an *unreasonable* restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect.'"  *Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1071 (11th Cir. 2004) (original emphasis) (citation omitted).  For this purpose, "an antitrust plaintiff must show harm to competition rather than to competitors.  That is, the 'anticompetitive effects' are measured by their impact on the market rather than by their impact on competitors."  *Id.*

WFG's collaboration claim is based largely on the BBB's downgrading of WFG and the AARP's decision not to print WFG's advertisements.  FAC ¶¶ 154-156.  There are two problems with this.  First, according to the FAC, it was **ARDA**, not Diamond, that induced the BBB and the AARP to take these actions.  FAC ¶¶

17

82-83, 86-91, 109; *see also id.* ¶ 92 (Paypal).  Diamond is a member of ARDA, but "participation in trade associations provides no indication of conspiring." *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295-96 (11th Cir. 2010).  Although the FAC is full of vague allegations (many on information and belief) that Diamond colluded with and through ARDA,[4] it alleges no supporting facts that would satisfy federal pleading standards.  *See Wyndham Vacation Ownership, Inc. v. Montgomery Law Firm, LLC*, No. 8:19-cv-1895-CEH-CPT, 2021 WL 4948151, at *13 (M. D. Fla. Oct. 18, 2021) (rejecting allegations that two timeshare developers "belong to a trade association for persons involved in the timeshare industry and that some unknown members of this association have, at some unspecified time, agreed to sue certain unidentified persons committing certain timeshare exit frauds").

Second, the alleged interference with the BBB and the AARP was directed at a single competitor (WFG), not at competition.  The Eleventh Circuit affirmed the dismissal of a similar claim in *Spanish Broadcasting System*:

> SBS [the plaintiff] focuses upon the harm it allegedly suffered at the hands of [the defendants], such as weakened stock prices, restricted access to capital markets, loss of employees, damaged reputation, and loss of advertising revenue.  None of those allegations assert damage to competition itself rather than damage to SBS, one competitor in the Spanish-language advertising market.

376 F.3d at 1072.

In amending the Complaint, WFG added allegations that, "[w]hile the developers initially compete for sales of timeshare interests," they then collude by not

---

[4] *E.g.*, FAC ¶¶ 7, 11-12, 70-75, 82, 93-94, 100-103.

4862-5196-5090.v1

"offer[ing] assistance in exiting a competitor-developer's timeshare."  FAC ¶¶ 149-150.  In fact, Diamond's Purchase and Security Agreements provide that if the purchaser relinquishes an interest in another timeshare resort, Diamond will accept a deed to that interest as partial payment for a Diamond membership.  Ex. A, ¶ 6.  In any event, Diamond and its competitors are in the business of selling timeshares. The Sherman Act does not require them to enter a new business of "assisting" other developers' customers to exit their timeshares.  And if WFG's complaint is that Diamond and its competitors have adopted similar policies for dealing with third-party exit companies (see FAC ¶¶ 103-107), it alleges no facts to raise an inference that this happened through collusion.  As in *American Dental Association*, "[t]he complaint does not plausibly suggest that by using similar methods …, [competitors] have acted in any way inconsistent with the independent pursuit of their own economic self-interest."  605 F.3d at 1295.  Indeed, the more plausible explanation for individual timeshare developers adopting such policies is to protect their timeshare owners from the same unlawful business practices of these third-party exit companies that are the subject of ongoing lawsuits.  *See* FAC ¶ 6.

## IV.   WFG Fails to State Any Claims under Florida Law

### A.   Florida Antitrust Claim (Count V)

WFG alleges in Count V that Diamond has violated the Florida Antitrust Act "by conspiring, collaborating, and/or contracting with others to restrain trade or commerce in Florida, by monopolizing or attempting to monopolize, and by unlawfully tying its exit services to its exit product."  FAC ¶ 167.  WFG's conclusory

19

repackaging of its federal antitrust tying, collaboration, and monopolization claims into a single claim under the Florida Antitrust Act fails for all the same reasons articulated in Parts I-III, above.  *See All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.,* 135 F.3d 740, 745 n. 11 (11th Cir. 1998) ("Federal and Florida antitrust laws are analyzed under the same rules and case law."); Fla. Stat. § 542.32.

### B.      Florida Deceptive and Unfair Trade Practices Act (Count VI)

WFG's Count VI describes two categories of allegedly deceptive and unfair conduct under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"): (1) Diamond's promotion and use of the Transitions program, including the Affidavits; and (2) Diamond's participation in ARDA, which has allegedly interfered with WFG's business.  FAC ¶ 175.

The FAC alleges that Diamond's Transitions program and Affidavit requirement are deceptive because Members are not informed of Diamond's supposed "blanket prohibition" against working with a third party to assist in an exit when they first purchase their timeshare interests.  FAC ¶¶ 175-176.  To state a FDUTPA claim based on a deceptive practice, the plaintiff must establish that the alleged "representation, omission, or practice is likely to mislead the consumer acting reasonably in the circumstances." *Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281, 1284-87 (11th Cir. 2007).  WFG cannot do so.

First, the underlying premise that Diamond prohibits its Members from "using counsel or any third party, including WFG, to assist them in exiting their Diamond timeshare" (FAC ¶ 175) is contradicted by the FAC's own allegations.  WFG alleges

that "certain owners" are required to sign an affidavit swearing that they have not worked with any third party to exit their Diamond timeshares.  FAC ¶ 8.  But, as the FAC acknowledges, those "certain owners" are only owners who are using the Transitions program, and the conditions to which they agree are ***not*** a "blanket prohibition" on any third-party assistance in obtaining any exit.  FAC ¶¶ 61, 64. Thus, the premise that Diamond has a "blanket prohibition" on working with third parties on exits is not supported by the FAC's allegations.

Nor does WFG explain how Diamond could mislead Members by not informing them, when they first purchase their timeshares, "that they cannot later work with a third party to exit or terminate their timeshares" (FAC ¶ 176), when, according to WFG, the Agreement "by its terms, lasts a lifetime" (FAC ¶ 25) and Members agree to obtain Diamond's approval to sell or transfer their Memberships. Ex. A.   The Transitions program provides a pathway for Members to terminate their Agreements beyond what the Agreements themselves provide; thus, it cannot be misleading for Diamond not to advise Members of the requirements of that program. As the Eleventh Circuit has explained, where allegedly deceptive representations are contradicted by contractual provisions to which the consumer agreed, the consumer cannot be "deceived" as a matter of law.  *Zlotnick*, 480 F.3d at 1284-87 (affirming dismissal of FDUTPA claim where express terms of the agreement foreclose that a reasonable consumer could be misled by "the circumstances surrounding" the agreement); *accord Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283, 1295 (S.D. Fla 2007).

21

The FAC also alleges as a deceptive practice Diamond's failure "to disclose to owners in its advertisements that their execution of these onerous and unconscionable Owner Affidavits is a requirement for participating in the Transitions program." FAC ¶ 179. Where, as here, a FDUTPA claim sounds in fraud, the allegations must satisfy Rule 9(b)'s heightened pleading standard. *See Altamonte Pediatric Assocs., P.A. v. Greenway Health, LLC*, No. 8:20-cv-604-VMC-JSS, 2020 WL 5350303, at *3 (M.D. Fla. Sept. 4, 2020). WFG, however, alleges no facts regarding these supposed advertisements, such as when and where they were made, who viewed them, and the content thereof. *See id.* at *5. Likewise, WFG's allegations of unspecified "other deceptive relinquishment programs" and "documents with similar contractual provisions" (FAC ¶ 175) cannot support a "FDUTPA claim [that] hinges on allegations of misrepresentations and concealments of material facts," which must be pled with particularity. *PB Property Management, Inc. v. Goodman Mfg. Co.*, No. 3:12-cv-1366-J-20JBT, 2013 WL 12172912 at *6 (M.D. Fla. Aug. 28, 2013); *see also Fidelity Nat'l Fin., Inc. v. Attachmate Corp.*, No. 3:15-cv-1400-HES-PDB, 2017 WL 3726687, at *4 (M.D. Fla. Mar. 1, 2017).

As to the FDUTPA claims resting on ***ARDA's*** alleged interference with WFG's business, WFG has not established a causal connection between its injuries and ***Diamond's*** conduct. *See Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (the elements of a FDUTPA claim are a deceptive act or unfair practice, causation, and actual damages). WFG alleges that Diamond has participated in ARDA, is a member of ARDA, and, on information and belief, has contributed

22

money to ARDA.  FAC ¶¶ 70-73.  But the FAC does not allege any facts to support that Diamond itself engaged in "unfair" interference with WFG's relationships with the BBB and AARP—it alleges only that ARDA did so.  FAC ¶¶ 81-91.  As the Supreme Court has long held, "[c]ivil liability may not be imposed merely because an individual belonged to a group. . .  For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims."  *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982).  The FAC does not allege any facts to support that Diamond held a specific intent to further ARDA's allegedly "illegal" aims, and or that Diamond engaged in any specific conduct that caused harm to WFG's relationships with the BBB and AARP.

### C.    Tortious Interference (Count VII)

Count VII of the FAC alleges that Diamond tortiously interfered with WFG's contracts with WFG's Diamond Member customers and with WFG's relationships with the BBB and AARP.  FAC ¶ 199.

As to Diamond's alleged interference with WFG's Diamond Member customers, a claim for tortious interference with contract cannot lie where the alleged interference is directed at a business relationship to which the defendant is a party.  *Genet Co. v. Annheuser–Busch, Inc.,* 498 So. 2d 683, 684 (Fla. 3d DCA 1986).  In other words, "the interfering defendant must be … a stranger to the business relationship."  *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,* 742 So. 2d 381, 386 (Fla. 4th DCA 1999).  Diamond is not a stranger to the business relationship

4862-5196-5090.v1

between WFG and its Diamond Member customers.  Rather, as WFG alleges, the purpose of the business relationship between WFG and its Diamond Member customers is to help Diamond Member customers end their Diamond contracts. FAC ¶ 45.  Diamond has an interest in its contracts with its own Members, and cannot, as a matter of law, unjustly interfere with that relationship.  *Rudnick v. Sears*, 358 F. Supp. 2d 1201, 1205 (S.D. Fla. 2005).  It is completely backwards for WFG to argue that Diamond's resistance to WFG's attempts to end Diamond Members' lifetime contracts is tortious interference with WFG's contracts with those same Members.  It is WFG's contracts that are, by their nature, designed to interfere with Diamond's existing lifetime contracts with its Members, not the other way around. *See Ahern v. Boeing Co.*, 701 F.2d 142, 144 (11th Cir. 1983) (providing, as an example, that a third party's solicitation of a customer to switch from Xerox to another brand of copier is not tortious interference, "*unless he suggests to us that we violate a contract with Xerox in so doing*.") (emphasis in original).

As to the alleged interference with WFG's "relationships" with the BBB and AARP, the FAC does not plausibly allege that Diamond took any actions to intentionally procure a breach of those relationships.  The FAC alleges only that ARDA "act[ing] as Diamond's agent" interfered with WFG's BBB accreditation and AARP advertising.  FAC ¶ 201.  In addition to the reasons articulated in Part III, above, WFG cannot impute ARDA's actions to Diamond because WFG has not established that ARDA is Diamond's "agent."  "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the

24

other shall act on his behalf and subject to his control, and consent by the other so to

act." *Raney v. Aware Woman Center for Choice, Inc.,* 224 F.3d 1266, 1268 (11th Cir.

2000).  Both the principal and the agent must consent to the agency; a mere

association is insufficient.  For Diamond to be ARDA's principal, Diamond must

have "the right or power to control and direct the physical conduct of [ARDA] in the

performance of the act. If there is no right to control, there is no liability." *Haynes v.*

*Wilder Corp. of Delaware*, 721 F. Supp. 2d 1218, 1225 (M.D. Fla. 2010) (internal

quotations omitted).  WFG has not alleged that Diamond controls ARDA's actions,

and could not do so, given that the FAC alleges "ARDA's membership comprises

over 350 companies" and that "[m]ost of the major [timeshare] developers have seats

on the board of ARDA."  FAC ¶¶ 101, 105.

### D.    Civil Conspiracy (Count VIII)

Florida law does not recognize civil conspiracy as a freestanding tort.  *SFM*

*Holdings, Ltd. v. Banc of America Securities, LLC*, 764 F.3d 1327, 1339 (11th Cir. 2014).

An action for civil conspiracy only exists if the basis for the conspiracy is an

independent wrong or tort which would constitute a cause of action if the wrong

were done by one person.  *Orange Lake Country Club, Inc. v. Reed Hein & Associates,*

*LLC*, 367 F. Supp. 3d 1360, 1369 (M.D. Fla. 2019).  The "independent wrong"

WFG alleges is "tortious[] interfere[nce] with WFG's contractual and business

relationships with the BBB, AARP, and WFG's customers."  FAC ¶ 209.  Since

WFG has not stated a claim for tortious interference, WFG's civil conspiracy claim

also fails.  *Turner v. Williams*, 65 F.4th 564, 590 (11th Cir. 2023).

4862-5196-5090.v1

**CONCLUSION**

For the foregoing reasons, the Court should dismiss WFG's Complaint in its

entirety.


Dated: February 2, 2024             Respectfully submitted,


                                    PILLSBURY WINTHROP SHAW PITTMAN LLP

                                    */s/ Roxane A. Polidora*
                                    ROXANE A. POLIDORA (admitted *pro hac vice*)
                                    roxane.polidora@pillsburylaw.com
                                    STACIE O. KINSER (admitted *pro hac vice*)
                                    stacie.kinser@pillsburylaw.com
                                    Four Embarcadero Center, 22nd Floor
                                    San Francisco, CA 94111-5998
                                    Telephone:  415.983.1000
                                    Facsimile:  415.983.1200

                                    GREENSPOON MARDER LLP

                                    */s/ Richard W. Epstein*
                                    Richard W. Epstein (Bar No. 229091)
                                    Jeffrey A. Backman (Bar No. 662501)
                                    200 East Broward Blvd., Suite 1800
                                    Fort Lauderdale, Florida 33301
                                    Telephone: 954-491-1120
                                    Facsimile: 954-343-6958
                                    richard.epstein@gmlaw.com
                                    maria.salgado@gmlaw.com
                                    jeffrey.backman@gmlaw.com
                                    mary.torres@gmlaw.com


                                    *Attorneys for Defendants, Diamond Resorts U.S.*
                                    *Collection; Development, LLC; Diamond Resorts; Hawaii*
                                    *Collection Development, LLC; and Diamond Resorts*
                                    *Management, Inc.*

4862-5196-5090.v1

## LOCAL RULE 3.01(g) CERTIFICATION

Counsel for Diamond Resorts U.S. Collection Development, LLC, Diamond Resorts Hawaii Collection Development, LLC, and Diamond Resorts Management, Inc. conferred with Counsel for Wesley Financial Group, LLC on January 25, 2024 and the parties were unable to resolve the issues raised in this motion.

Dated: February 2, 2024                    By:   */s/ Roxane A. Polidora*
_____

*Counsel for Defendants Diamond Resorts U.S. Collection Development, LLC, Diamond Resorts Hawaii Collection Development, LLC, and Diamond Resorts Management, Inc.*

4862-5196-5090.v1

# EXHIBIT A



[BCD]

[CNS]

**DIAMOND RESORTS U.S. COLLECTION**
**PURCHASE AND SECURITY AGREEMENT**
**(Tennessee)**

**THIS PURCHASE AND SECURITY AGREEMENT** (this "**Agreement**") is between **[LNS]** ("**You**") and Diamond Resorts U.S. Collection Development, LLC, a Delaware limited liability company ("**Diamond**"). Diamond's address and principal place of business is 10600 West Charleston Blvd., Las Vegas, Nevada 89135 and telephone number is 1-877-374-2582. Refer to the Third Amended and Restated Declaration for Diamond Resorts U.S. Collection ("**Declaration**") for the meaning of capitalized terms.

Diamond agrees to sell and You agree to purchase a timeshare interest or "**Membership**" in the Diamond Resorts U.S. Collection ("**Collection**"). Your Membership in the Diamond Resorts U.S. Collection Members Association, a non-stock, non-profit Delaware corporation (the "**Association**") includes the following Points:

**Points:**     [RTP]_____     **Initial Use Year:**     [IUY]_____

**HERE ARE THE BASIC PURCHASE TERMS AND AN ITEMIZATION OF THE AMOUNT FINANCED**

| | | |
|---|---|---|
| 1. | Purchase Price of Membership: (**"Purchase Price"**) | _____ [PPA] |
| 2. | Initial Cash Deposit: | _____ [DPA] |
| 3. | Less *trade in credit* of any Timeshare Interest conveyed to Diamond as part of your purchase: (applies only to "upgrade" sales) | |
| | a. Ascribed credit for Timeshare Interest(s): | _____ [EQT] |
| | b. Other Amounts Owed:  **[WI_FIN_DESC]** | _____ [WI_FIN_AMT] |
| | c. Total Trade in credit: (line a minus line b) | _____ [WI_NET_EQT] |
| | d. Other Amounts Paid at closing:  **[WI_BUY_DESC]** | _____ [WI_BUY_AMT] |
| 4. | Additional Cash Deposits Due: | |
| | a. On or before:     **[MC1]**_____ | _____ [DA1] |
| | b. On or before:     **[MC2]**_____ | _____ [DA2] |
| |      **[CON_DDP_PYMT_DATE_1]** | |
| |      **[CON_DEF_TOTAL_NUM_PYMT]** | **[CON_DEF_DOW** |
| | **[CON_DEF_DOWN_PYMT_LBL] [CON_DDP_BASE_PYMT_1]** | **N_PYMT]** |
| 5. | Total Down Payment: (total of lines 2, 3.c, 4.a., and 4.b.) | _____ [DPT] |
| 6. | Credits (if any): | _____ [CDT] |
| 7. | Base Amount: (line 1 minus line 5 minus line 6) | _____ [BLA] |
| 8. | Financed Closing Costs payable to Diamond | _____ [FCC] |
| | [SAM_LBAL] [SAM_LBAL_AMT] | |
| 9. | Amount Financed or Due in Cash at Closing (line 7 plus line 8): (**"Unpaid Balance"**) | _____ [PPN] |
| 10. | Current Outstanding Principal Balance plus Accrued but Unpaid Interest Due on Existing Timeshare Interest: | _____ [OPI] |
| 11. | Total Amount Financed or Due in Cash at Closing (line 9 plus line 10): (**"Unpaid Balance"**) | _____ [FAM] |

**Closing Costs**

| | | |
|---|---|---|
| A. | Closing Costs to Diamond | _____ [CCS] |
| B. | Closing Costs to You | _____ [CCB] |
| C. | Total Estimated Closing Costs | _____ [CCA] |

**Other Costs**

| | | |
|---|---|---|
| D. | Initial Use Year's Association standard Assessments (estimated): You will be billed for Assessments separately by the Association | $[MF1] |

Page 1 of 7

You agree to pay the Unpaid Balance in U.S. currency by the following method

☐  Financing by Diamond    ☐  Credit Card Type _____  Number _____    Expiration Date _____

You must pay all charges related to receiving financing. These charges are described in the Truth-in-Lending Disclosure Statement.

<u>Monthly Payment Method</u>:

☐  Statement         ☐  SurePay (Credit or Debit Card)      ☐  SurePay (Checking or Savings Account)

## YOUR PROMISES AND ACKNOWLEDGMENTS

You make the following promises and acknowledgments by signing this Agreement:

1.  You received the Collection Instruments and state timeshare disclosure documents and attached exhibits, which are all considered part of this Agreement. You will be bound by, and comply with, the terms of these documents.

2.  You received a completed Truth-in-Lending Disclosure Statement before signing this Agreement.

3.  All information You submit to Diamond to receive Financing is accurate.

4.  You are purchasing the Membership for your personal use and enjoyment. You are not purchasing the Membership as a financial investment or for financial returns of any kind, including through resale, refinancing, tax advantages, or appreciation or depreciation. Diamond has not made any promises about such benefits.

5.  Neither You nor your relatives own more than 10 Memberships in the Collection.

6.  You may not use the Collection Accommodations for any commercial purpose, including commercial rental activities. Commercial rental activities include using the Internet or other media to advertise rental opportunities.

7.  The persons signing this Agreement are legally capable and authorized to do so.

## TERMS AND CONDITIONS

1.       <u>Timeshare Program</u>.  Points are the currency of use in the Collection. Points are allotted annually and allow You to reserve Use Periods in available Collection Accommodations. Your Membership is a perpetual "right-to-use" timeshare interest and does not expire. You will not receive a deed to real property. To use your Points You must make reservations according to the Rules and Regulations, which along with the other Collection Instruments, Diamond has the right to modify. Reservations are granted on a "first-come, first-served," space-available basis. You will not have the guaranteed right to reserve or use any particular Use Period or Collection Accommodation.

2.       <u>Maintenance Fees</u>. You must pay Assessments (also known as "Maintenance Fees") annually to the Association for as long as You own your Membership. The amount of the Maintenance Fees will increase annually to maintain the quality of the Collection's resorts. These annual increases are subject to the limits described in the Collection Instruments. If You do not timely pay all Maintenance Fees and any other amounts owed or if You are otherwise in default under the terms of this Agreement, You may be prohibited from making a reservation, using a Collection Accommodation, or exercising any other rights of Membership. Continued failure to pay Maintenance Fees will also result in the loss of your Membership. You must pay Maintenance Fees even if You do not use the Collection Accommodations.  Your obligation to pay Maintenance Fees includes the obligation to pay any Special Assessment levied by the Association pursuant to the governing documents. Any applicable state and real estate taxes are included in your annual Maintenance Fees.

3.       <u>Transfers and Resale of Membership</u>. You must receive approval from the Association and pay a transfer fee before You sell or transfer your Membership. The Association may deny a transfer of your Membership to another if the buyer is a known or suspected fraudulent Person or is delinquent in the payment of any fees to Diamond or the Association.  A transfer fee will apply for approved transfers. No transfer fee will apply if your Membership passes to an heir or beneficiary upon your death.  Diamond does not currently offer a resale, buyback or rental program and does not assist with third party transfers.

4.       <u>Exchange Companies</u>. You are automatically enrolled in The Club exchange program and required to pay The Club fees.  The Club is operated by Diamond Resorts International Club, Inc. ("DRIC"). Dues for The Club may be collected together with your Maintenance Fees. DRIC must consent to any transfer of membership in The Club. Transfer of your Collection Membership does not transfer your membership in The Club without the written consent of DRIC**.** The Club is currently affiliated with Interval International, Inc. ("Interval") and as a member of The Club You currently have access to Interval's exchange services. Exchanges through Interval are subject to Interval's conditions and fees. Diamond does not control or make any representations about Interval, or any other exchange programs, including current or future exchange services and the cost, or availability of any exchange program.

5.       <u>Financing of Purchase Price</u>. Subject to Diamond's approval in Diamond's sole discretion, You may pay for your Membership through credit from Diamond ("Financing").  You must sign and deliver an installment Promissory Note (the "Note") payable to Diamond for the Unpaid Balance. If requesting Financing, You authorize Diamond to check your credit, including through a consumer reporting agency. You may be prohibited from making a reservation or using a Collection Accommodation, or exercising any other Membership rights You would otherwise have, unless You timely pay all amounts due under the Note.  If You already own a timeshare interest (the "Existing Timeshare Interest") that You acquired from Diamond or an affiliate of Diamond (collectively, "Diamond Resorts"), and

Diamond Resorts financed part of the purchase price of the Existing Timeshare Interest, then Diamond may (but does not have to) cause Diamond Resorts to cancel the promissory note made by You to the order of Diamond Resorts when You purchased the Existing Timeshare Interest. If this occurs, then the outstanding principal balance of that promissory note, together with any accrued but unpaid interest that is due on that promissory note, will be added to the original principal amount of the Note, subject to all of the terms of this Section.  In addition, if Diamond so requests, You agree to sign and deliver to Diamond, on the date of this Agreement, a declaration of annexation or other similar type of document, by which the Existing Timeshare Interest is subjected to the Declaration (the "Diamond Resorts Annexation Instrument").  Diamond may record this Diamond Resorts Annexation Instrument upon Closing.  If your purchase of a Membership does not close for any reason, the Diamond Resorts Annexation Instrument will be returned to You.  Whether or not your purchase closes, You will remain responsible for all costs, expenses, and other obligations related to the Existing Timeshare Interest.

6.      Third-Party Timeshare. If You relinquish a timeshare interest in another timeshare resort ("Third-Party Timeshare") as partial payment for your Membership, You agree to sign and deliver a deed or other instrument acceptable to Diamond, conveying all of your interest in the Third-Party Timeshare to Diamond or a party designated by Diamond, free and clear of any debt not expressly approved by Diamond ("Deed-transfer").  Diamond may record the Deed-transfer at Closing (described in Section 8 below). Until Closing occurs, You are responsible for all obligations related to the Third-Party Timeshare, including paying assessments and fees ("Third-Party Timeshare Obligations").  If the Closing does not happen, the Deed-transfer will be cancelled and returned to You, and You will remain responsible for the Third-Party Timeshare Obligations.

7.      Escrow. All payments made to Diamond before Closing will be held in escrow in a non-interest bearing account by First American Title Insurance Company ("Escrow Agent") according to a Master Escrow Agreement. You expressly waive any right to earn interest on the escrow account. Escrow Agent's address is 400 S. Rampart Boulevard, Suite 290, Las Vegas, Nevada 89145. Escrow Agent will hold all funds until Closing or this Agreement is cancelled.

8.      Closing. "Closing" is the date when all of the following have occurred: **(i)** any cancellation period has expired and You have not exercised your right to cancel in writing; **(ii)** You and Diamond have signed all documents needed to transfer the Membership to You; and **(iii)** Diamond has received from You either (a) a signed Note for the Unpaid Balance, or (b) the Unpaid Balance in immediately available funds. You agree to execute any other documents Diamond deems necessary and to otherwise cooperate to bring about the Closing and fulfill the purposes of this Agreement, the Note, and the Deed-Transfer (as applicable).  Upon Closing, the Association will place your name in the Register of Members and give You a Points Certificate. If Closing has not happened within one year after this Agreement is signed or You have exercised your right to cancel this Agreement, Diamond will order Escrow Agent to refund any funds held on your behalf, without interest, to You. Cancellation terminates this Agreement in its entirety.

9.      Security Interests. You grant to Diamond a security interest and lien on all of your interest and rights in the Membership (the "Security Interest"). This Security Interest is granted to secure your performance under the Note, this Agreement, and the Collection Instruments. You irrevocably authorize Diamond, as a secured party, to file any financing statement, continuations, or amendments necessary or desirable to perfect, preserve, and protect the Security Interest.

10.     Jointly and Severally Liable. If two or more individuals purchase a Membership together, then ownership is as joint tenants with rights of survivorship, and not as tenants-in-common. Everyone who purchases a Membership must keep all of the obligations made in this Agreement. This means that each purchaser is responsible for making payments due under the Note and this Agreement. Diamond can enforce its rights against each purchaser separately.

11.     Diamond's Obligations. You agree that immediately after Closing, Diamond will have no obligations or liabilities under this Agreement. After Closing, You must look to the Association and the Manager to fulfill or maintain your rights as a Member of the Collection.

12.     Indemnity. You agree to indemnify and hold Diamond harmless from and against all loss, threat of loss, suits, claims, actions, liabilities, damages, obligations, demands, costs and expenses (including attorney's fees) connected to You defaulting in any of the obligations of this Agreement, the Note, or the Collection Instruments.

13.     **NO WARRANTIES. DIAMOND MAKES NO WARRANTIES, EXPRESS OR IMPLIED, OF ANY TYPE WHATSOEVER REGARDING THE COLLECTION OR THE COLLECTION ACCOMMODATIONS, INCLUDING BUT NOT LIMITED TO WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.  DIAMOND EXPRESSLY DISCLAIMS, AND YOU IRREVOCABLY WAIVE, EACH OF THE FOREGOING WARRANTIES.**

14.  Default by You.

14.1    **Event of Default.**  You are in default if any of these things happen:

(i) You do not pay Diamond any amounts due under this Agreement, the Note or the Collection Instruments and You do not cure this failure within 10 days after You receive written notice of nonpayment;

(ii) You do not fulfill any other obligation in the Note, this Agreement or any of the Collection Instruments and You do not cure this failure within 30 days after You receive written notice about your failure; or

(iii) any information You have provided in the Note, this Agreement or any written statement given to Diamond or the Association is false or misleading.

14.2    **Your Default before Closing.** If You default prior to Closing and do not cure such default on or before Closing, Diamond can immediately terminate this Agreement and all of your rights in this Agreement.  After termination, Diamond will keep (or cause Escrow Agent to give to Diamond) all money You paid under this Agreement as liquidated damages and not as a penalty.

14.3     **Your Default after Closing.** If You default after Closing and do not cure the default within the applicable time period, Diamond (or its successor or assign) may:

(i) give You written notice that your Membership will be terminated and then terminate your Membership (including any existing reservations) within 60 days of the date of the notice and keep all amounts paid as liquidated damages and not as a penalty;

(ii) declare all amounts due under the Note and this Agreement immediately due and payable;

(iii) enforce the Security Interest against your Membership according to Article 9 of the UCC and applicable law; and

(iv) pursue any other remedy available. Diamond may pursue any or all of these remedies; the exercise of one right or remedy does not exclude any other rights or remedies available.

15.     Default by Diamond. If Diamond does not comply with the material provisions of this Agreement, then Diamond's only obligation is to refund or cause Escrow Agent to refund to You all payments previously made under this Agreement, without interest. After such refund is made, this Agreement is automatically cancelled, and all rights and obligations in this Agreement immediately terminate. **TO THE EXTENT PERMITTED BY APPLICABLE LAW, YOU WAIVE ALL RIGHTS AND REMEDIES THAT MIGHT OTHERWISE BE AVAILABLE TO YOU, AT LAW OR IN EQUITY.**

16.     **ARBITRATION PROVISION ("Provision").**

16.1     Arbitration of Claims. Any Claim (defined in Section 16.2 below) between You and Diamond, whether preexisting, present or future, arising from or relating to this Agreement or the Collection shall, at the election of either party, be arbitrated on an individual basis before JAMS (www.jamsadr.com, 1-800-352-5267) pursuant to its Streamlined Rules.  If JAMS cannot serve and the parties cannot agree on a substitute, the American Arbitration Association ("AAA," www.adr.org) shall serve as the arbitration body for the Claim.  If the AAA cannot serve, a court with jurisdiction shall select the arbitration body or arbitrator. The Federal Arbitration Act ("**FAA**"), 9 U.S.C. § 1, et seq., shall govern the interpretation and enforcement of this Provision. A single neutral arbitrator shall be appointed. The arbitrator shall follow applicable substantive law consistent with the FAA, apply applicable statutes of limitations, honor valid claims of privilege, and issue a written reasoned decision which will be final and binding except for any review under the FAA.  The arbitrator may award all remedies that would apply in an individual court action (subject to constitutional limits that would apply in court).  Any in-person hearing will be held in the county where this Agreement was signed unless otherwise agreed.  If You initiate an individual arbitration, Diamond will pay all administrative and arbitrator fees exceeding $250.  Solely for purposes of this Provision, "**Diamond**" also means Diamond's parent companies, subsidiaries and affiliates; the employees, officers and directors of Diamond and its parent companies, subsidiaries and affiliates; and any other person or entity named as a defendant or respondent in a Claim by You against Diamond.  "**You**" also means your heirs, successors and assigns.

16.2     Claims. "Claim" shall be broadly construed and includes, without limitation, disputes concerning: purchase, financing, ownership or occupancy; breach, termination, cancellation or default; condition of any Collection Accommodation; THE Club or other exchange programs; reservations, points or rewards programs; applications and personal information; marketing or sales solicitations, representations, advertisements, promotions or disclosures; and collection of delinquent amounts and the manner of collection. "Claim" also includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, Uniform Commercial Code, regulation, ordinance, common law and equity. "Claim" does not include: (i) disputes about the validity, enforceability, coverage or scope of this Provision or any part thereof, which are for a court to decide, provided that disputes about the validity or enforceability of this Agreement as a whole are for the arbitrator to decide; (ii) any individual action by You in small claims or an equivalent court, unless that action is transferred, removed or appealed to a different court; or (iii) Diamond's use of judicial or non-judicial relief to enforce a security agreement, relating to the Membership. The institution and maintenance of any such action shall not waive any party's right to compel arbitration of any other Claim subject to arbitration, including, without limitation, the filing of a counterclaim in a suit brought by Diamond.  In any such action commenced by Diamond, You may assert any cognizable defense permitted by applicable law which does not seek any form of affirmative relief from Diamond, including, without limitation, damages.

16.3     **Class Action Waiver.  If a Claim is arbitrated, neither You nor Diamond will have the right to (i) participate in a class action in court or in arbitration, either as a class representative or class member, (ii) act as a private attorney general in court or in arbitration, or (iii) join or consolidate Claim(s) with claims of any other person or entity.  The arbitrator shall have no authority to conduct any class, private attorney general or multiple-party proceeding or to issue any relief that applies to any person or entity except You and Diamond individually.**

16.4     Application of the Provision. An arbitration award may be enforced in any court with jurisdiction.  No arbitration award involving the parties will have any preclusive effect as to issues or claims in any dispute involving anyone who is not a party to the arbitration, nor will an arbitration award in prior disputes involving other parties have preclusive effect in an arbitration between the parties to this Provision.This Provision shall survive the breach, cancellation, termination or rescission of this Agreement, and any bankruptcy to the extent permitted by law.  This Provision governs if it conflicts with the Agreement or the arbitration rules.  If any part of this Provision is declared unenforceable, the remainder shall be enforceable, except that: (A) If the Class Action Waiver is declared unenforceable in a proceeding between You and Diamond, without impairing the right to appeal such decision, this entire Provision (except for this sentence) shall be null and void in such proceeding; and (B) If a Claim is brought seeking public injunctive relief and a court determines that the restrictions in Section 16.3 prohibiting the arbitrator from awarding relief on behalf of third parties are unenforceable with respect to such Claim (and that determination becomes final after

all appeals have been exhausted), the Claim for public injunctive relief will be determined in court and any individual Claims seeking monetary relief will be arbitrated.  In such a case the parties will request that the court stay the Claim for public injunctive relief until the arbitration award pertaining to individual relief has been entered in court.  In no event will a Claim for public injunctive relief be arbitrated.

16.5     Right to Reject Arbitration Provision.  You may reject this Provision by sending Diamond a written notice which gives your name and Agreement number with a statement that You reject the Arbitration Provision.  The rejection notice must be sent by certified mail, return receipt requested, to 10600 West Charleston Blvd., Las Vegas, Nevada 89135, Attn: Arbitration Rejection Notice.  A rejection notice must be signed by You and received by Diamond within thirty (30) days after You sign this Agreement.  Rejection of arbitration will not affect any other term of this Agreement.

16.6     **Your Acknowledgment. You have read, understand and voluntarily agree to this Arbitration Provision and acknowledge that if a Claim is arbitrated, You will have no right to have a court or jury trial or participate in a class action.**

17.     Additional Important Information.

| No Other Agreements | This Agreement is the only agreement that governs the purchase of your Membership, and supersedes and replaces all prior negotiations, agreements, and understandings, both oral and written. No amendment to or modification of this Agreement is valid without the written approval of Diamond's legal counsel. |
|---|---|
| Notices | You must give all notices in writing. Notices to You may be made either in person, by telephone, electronic mail, or writing. Written notices may be delivered, emailed or mailed, to each party at its address shown in this Agreement, or other address provided. A written notice is considered given and received when delivered, or emailed, or 3 business days after it is deposited into the mail, properly addressed. If multiple individuals own this Membership, notice to one of You is considered notice to all of You. If you are a corporation or entity, notice to You may be made to any corporate officer or general partner. |
| Governing Law; Waiver of Jury Trial | This Agreement is governed by Nevada law without regard to Nevada's choice of law rules. You must bring any legal action in an appropriate court of competent jurisdiction. **EXCEPT AS OTHERWISE PROVIDED BY APPLICABLE LAW, YOU WAIVE YOUR RIGHT TO A TRIAL BY JURY FOR A LEGAL ACTION ARISING UNDER THIS AGREEMENT.** |
| Assignment | Your Membership cannot be sold, assigned, transferred, conveyed, or encumbered except as this Agreement allows.  You cannot assign your rights under this Agreement and Note without Diamond's written consent, which Diamond may withhold. Diamond may assign its rights under this Agreement. |
| Severability | The terms of this Agreement are severable. The invalidity of any term of this Agreement does not affect any other term of this Agreement. |
| Credit Reporting | We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report. |
| Miscellaneous | This Agreement is effective as of the date You sign and any cancellation period begins on the date You sign. This Agreement may be signed in counterparts. No provision is waived by failure of a party to enforce it. You give Diamond the right to correct any clerical or other non-material errors in this Agreement or related documents. The captions in this Agreement are for informational purposes only.  You are advised to read each and every paragraph carefully and not just the captions. |

18.     Electronic Transactions.

18.1     Electronic Signatures and Copies.  This Agreement, together with all documents and instruments related to this Agreement, the Collection, your Membership, Diamond's affiliates, or the Association to be signed by You and/or  Diamond, may be executed electronically or manually.  Execution may be completed in counterparts (including both counterparts that are executed on paper and counterparts that are electronic records and executed electronically), which together constitute a single agreement.  As between You and Diamond, any copy of this Agreement (including a copy printed from an image of this Agreement that has been stored electronically) shall have the same legal effect as an original.

18.2     Transferable Record.  If Diamond is providing Financing to You and You sign an electronically created Note (the "eNote") using an electronic signature, You agree that the eNote will be a "transferable record" under the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

18.3     Provenance.  Diamond shall upload all applicable electronically executed documents or instruments, including without limitation this Agreement and any eNote, to Diamond's electronic vault hosted by eOriginal, Inc. or a similar vendor (the "Original Vault").  If any document or instrument is manually executed, Diamond may, in its discretion, convert the tangible record of the document or instrument into electronic form and cause the electronic version to be uploaded to the Original Vault.  Collectively, any document or instrument uploaded to the Original Vault shall be referred to as a "Vaulted Document."  For purposes of establishing security interests or rights in, or title to, any Vaulted Document, You and Diamond agree as follows:

(a)  no original, tangible, or manually executed Vaulted Document will be the authoritative copy, original, or transferable record of the Vaulted Document;

(b) except as expressly provided in subsection (e) below, possession of a tangible, manually executed original, transferable record or copy of the Vaulted Document will not perfect or prove any security interest, or establish title to or any other right;

(c) the sole authoritative copy and transferable record of any Vaulted Document will be the one uploaded into the Original Vault (the "Authoritative Copy");

(d) at Diamond's or its successor's discretion, the Authoritative Copy of any Vaulted Document may be printed and marked or designated by Diamond or such successor as the tangible Authoritative Copy of the Vaulted Document; and

(e) no person or entity (including, without limitation, any lender, subsequent assignee or purchaser, custodian or trustee of any Vaulted Document) will have rights in, title to or a security interest in such Vaulted Document, unless such person or entity can demonstrate that it has possession or control of the Authoritative Copy of the Vaulted Document (whether in tangible or electronic form) whose provenance can be established to the initial authoritative copy first uploaded to the Original Vault.

18.4       <u>Rights to Vaulted Documents</u>.  Any person who asserts or attempts to gain title to or a security interest or rights in, any Vaulted Document by any procedure except as provided above, including by possession of a tangible, manually executed original or copy or an electronic, non-authoritative copy of such Vaulted Document, violates the rights of Diamond and any subsequent assignee.

<u>**NOTICE**</u>

<u>**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF.  RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR.**</u>

*(Section 19, the Truth in Lending Disclosure (if financed) and Signature Page Follows.)*

Contract # [CNN]

19. **STATE SPECIFIC PROVISIONS:**

**YOU MAY CANCEL A CONTRACT TO PURCHASE A TIME-SHARE INTERVAL WITHIN TEN (10) DAYS FROM THE DATE OF THE SIGNING OF THE CONTRACT, WHERE YOU HAVE MADE AN ON-SITE INSPECTION OF THE TIME-SHARE PROJECT BEFORE SIGNING THE CONTRACT, AND, IF YOU HAVE NOT MADE SUCH AN INSPECTION, WITHIN FIFTEEN (15) DAYS FROM THE DATE OF THE SIGNING OF THE CONTRACT. IF YOU ELECT TO CANCEL, YOU MAY DO SO BY HAND DELIVERING NOTICE TO THE SELLER AT 10600 WEST CHARLESTON BLVD., LAS VEGAS, NV 89135 WITHIN THE DESIGNATED PERIOD, OR BY MAILING NOTICE TO THE SELLER (OR HIS AGENT FOR SERVICE OF PROCESS) BY PREPAID UNITED STATES MAIL AT DIAMOND RESORTS U.S. COLLECTION C/O RESCISSION COORDINATOR, DIAMOND RESORTS FINANCIAL SERVICES, 10600 WEST CHARLESTON BLVD., LAS VEGAS, NV 89135 POSTMARKED ANYTIME WITHIN THE DESIGNATED PERIOD.**

This Agreement is made and entered into this **[DMY].**

**PURCHASER:**

Signature: **[LN1]**

Street Address: **[AD1]**

City, State, Zip Code: **[CS1]**

Home Telephone Number: **[HT1]**

Business Telephone Number: **[BT1]**

E-Mail Address: **[EM1]**

Signature: **[LN2]**

Street Address: **[AD2]**

City, State, Zip Code: **[CS2]**

Home Telephone Number: **[HT2]**

Business Telephone Number: **[BT2]**

E-Mail Address: **[EM2]**

Signature: **[LN3]**

**PRIMARY MEMBER**: [LN1]

Primary Member's Address (if not set forth above):

Signature: **[LN4]**

**SELLER:**
Diamond Resorts U.S. Collection Development, LLC,
a Delaware limited liability company

By:  Diamond Resorts Developer and Sales Holding Company,
a Delaware corporation, its sole manager
**By:**

Authorized Representative

Printed Name                    Date

 [SAL]
Sales Agent (Print)

## CERTIFICATE OF SERVICE

I certify that on February 2, 2024, I filed the foregoing using the Court's case management electronic case filing system, which will automatically serve notice of the filing on registered users of that system.

By:  /s/ Roxane A. Polidora

*Counsel for Defendants Diamond Resorts U.S. Collection Development, LLC, Diamond Resorts Hawaii Collection Development, LLC, and Diamond Resorts Management, Inc.*

4862-5196-5090.v1